On Application For Rehearing
The opinion released on March 26, 1993, is withdrawn, and the following opinion is substituted.
The plaintiffs appeal from a summary judgment for five co-employee defendants in a personal injury action filed pursuant to Ala. Code 1975, § 25-5-11(c)(2).[1] The judgment *Page 1059 
for the five co-employee defendants was made final pursuant to Rule 54(b), A.R.Civ.P., and this appeal followed. We affirm.
The following summary of essential facts is taken from the trial court's "Opinion and Order on Motion for Summary Judgment":
 "Plaintiff William C. Hallmark was a general mechanic for Scott Paper Company who was assigned to the Chemical Preparation Department ('Chem Prep' Department) of the Pulp Mill at the Mobile Plant. Defendants Robert G. Duke, José Stambuk, Leon Cleveland, R.P. Johnston, and John Brodbeck are all co-employees of Hallmark. Duke is Manager of safety, health, and security. Stambuk is product system leader for the Chem Prep Department. Cleveland is operating floor leader for the Chem Prep Department. Johnston is an hourly employee who had been temporarily promoted to caustic operator in the department during the week when the accident occurred. Brodbeck is also an hourly employee who had been temporarily promoted to assistant caustic operator during that week.
 "Hallmark was burned on August 17, 1990, when a pipe in the white liquor clarifying system in the Chem Prep Department ruptured and showered him with caustic liquor. . . .
 "The Chem Prep Department receives 'green liquor' from the Recovery Department and processes it into 'white liquor.' White liquor is the caustic chemical solution used to break wood chips down into pulp. The green liquor flowing from the Recovery Department first enters slakers, where it combines with lime burned in Chem Prep's kilns. From there, this lime-saturated liquor flows to six 'clarifiers,' where excess lime precipitates from the solution, leaving white liquor. The white liquor then goes to storage or to the Pulp Preparation Department's digesters.
 "Upon leaving the slakers, the lime-saturated liquor flows first to a 'splitter box,' which in turn directs the liquor to the department's six clarifiers. Six transfer pipes, each controlled by a 'splitter box valve,' lead from the splitter box to the individual clarifiers. The transfer pipelines and their valves are integral components of the system. The pipes are the most practical means of transferring the liquor from the splitter box to the clarifiers. The individual valves allow the plant to take any one or more of the clarifiers out of service without halting the entire liquor-processing system.
 "Each clarifier, a tank-like structure, is divided into three levels, or trays. Once the excess lime precipitates out of the solution, the resulting white liquor flows out of the clarifier through a nozzle, thence by pipe to an 'outflow box' affixed to the top edge of each clarifier. The flow from the three trays combines in the outflow box and then flows by pipe to other points in the liquor-processing system.
 "The elbow that ruptured, resulting in Hallmark's injury, had linked a nozzle coming from the bottom tray on the no. 2 northwest white liquor clarifier to a pipe leading up to an outflow box. The elbow was a pipe that was a component part of the system, in that it carried white liquor from the clarifier to the outflow box.
 "Plaintiff had responsibility for checking the piping system surrounding the white liquor clarifiers. About three weeks prior to the accident, Hallmark was inspecting his area of responsibility and discovered that the elbow joint pipe in question had apparently developed a leak. The apparent leak was evidenced by a crystal forming on the outside of the elbow. Hallmark mentioned the apparent leak to a caustic operator, a fellow hourly employee, but he did not mention it to supervision or otherwise arrange for its repair.
 "On the morning of the day of the accident, Cleveland first noticed the same apparent leak. He immediately instructed maintenance personnel to repair the leaking elbow joint pipe. He also instructed Johnston, who was acting as Caustic Operator that shift, to take the no. 2 northwest White Liquor Clarifier out of service so that the elbow could be replaced.
 "Beginning at about noon, Johnston isolated and then began draining the no. 2 northwest White Liquor Clarifier. He *Page 1060 
drained the tank until about 1:15 p.m., then notified the mechanics that the clarifier was ready for their maintenance work. At about 3:30 p.m., the mechanics took a replacement elbow to the site to replace the defective elbow. While Hallmark was in the process of removing the old elbow, white liquor began leaking from the seal between the nozzle and the elbow at such a rate that the Maintainer in the Chem Prep Department, James McCormick, ordered Hallmark to stop his work and get away from the pipe. Instead of climbing down a nearby ladder to get away from the elbow, however, Hallmark climbed up onto an angle iron that was only about 40 inches from the elbow.
 "McCormick then went to the top of the clarifier to determine whether it still contained liquor. About three or four minutes after McCormick left the work site to climb to the top of the clarifier, the elbow ruptured, spraying hot, caustic liquor onto Hallmark. After the accident, the clarifier was found to contain liquor despite the isolation procedure performed earlier in the day."
The plaintiffs sued five co-employees of William Hallmark — Duke, Stambuk, Cleveland, Johnston, and Brodbeck — alleging both negligence and, pursuant to Ala. Code 1975, § 25-5-11(b) and (c)(2), willful and intentional misconduct. The trial court granted the defendants' motion to dismiss the negligence claim, and the case proceeded on the claims made pursuant to §25-5-11(b) and (c)(2). The trial court later granted the defendants' motion for summary judgment as to those claims; the plaintiffs appeal from the resulting judgment.
We first address the plaintiffs' argument that the trial court erred in dismissing the negligence claim against the five co-employee defendants and in refusing to declare invalid Act 85-41, Ala. Acts 1985 (the 1985 amendment to the Workers' Compensation Act). This Court held adversely to the plaintiffs' position in the recent case of Jones v. Lowe, 611 So.2d 345
(Ala. 1992); therefore, the dismissal of the negligence claim is affirmed. See, also, Blake v. Big B, Inc., 613 So.2d 1265
(Ala. 1993).
The plaintiffs' remaining claims against these defendants are based on § 25-5-11(b) and (c)(2), which provide, in pertinent part, as follows:
 "(b) If personal injury or death to any employee results from the willful conduct, as defined in subsection (c) herein, of any . . . employee of the same employer, . . . the employee shall have a cause of action against the person. . . .
 "(c) As used herein, 'willful conduct' means any of the following:
". . . .
 "(2) The willful and intentional removal from a machine of a safety guard or safety device provided by the manufacturer of the machine with knowledge that injury or death would likely or probably result from the removal; provided, however, that removal of a guard or device shall not be willful conduct unless the removal did, in fact, increase the danger in the use of the machine and was not done for the purpose of repair of the machine or was not part of an improvement or modification of the machine which rendered the safety device unnecessary or ineffective."
The plaintiffs' amended complaint contains two separate counts alleging willful and intentional conduct on the part of the co-employee defendants. Count 5 alleges that the co-employee defendants willfully and intentionally failed to use the clarifier's splitter box valve, elbow pipe joint, and transfer pipelines, which, claim the plaintiffs, are safety guards and devices. In Count 6, the plaintiffs alleged that the co-employee defendants willfully and intentionally failed to maintain or repair the elbow pipe joint that ruptured and that they willfully and intentionally failed to use "safety devices" to determine whether the clarifier was actually empty and ready for Hallmark to begin work.
The trial court held that the clarifier's transfer lines, elbow pipe joint, and splitter box valve were not safety guards or safety devices, but were "component parts of the clarifier whose principal purpose is to facilitate the work," and that there was no evidence to support the plaintiffs' claim that the five co-employees had willfully or intentionally *Page 1061 
failed to use or repair any of the system's components that the plaintiffs contended were safety guards or devices. The court further held that defendant Johnston's using the splitter box valve and the transfer line connecting the splitter box and the clarifier was undisputed evidence precluding the plaintiffs' argument of "failure to use" parts of the system that the plaintiffs claimed were safety devices.
Because this is an appeal from a summary judgment, this Court views the evidence in a light most favorable to the Hallmarks to determine whether there was "evidence of such weight and quality that fairminded persons in the exercise of impartial judgment [could] reasonably infer the existence of the fact sought to be proved" by the plaintiffs. West v. Founders LifeAssurance Co. of Florida, 547 So.2d 870 (Ala. 1989).
In three recent decisions, this Court has interpreted and applied § 25-5-11(c)(2). In Bailey v. Hogg, 547 So.2d 498
(Ala. 1989), the injured employee brought a § 25-5-11(c)(2) action against his employer, who knew that a safety guard, delivered with new machinery to be used at the employer's plant, was never installed on the machinery. This Court held that the employer's willful and intentional failure to install
an available safety device (that could have prevented the employee's injury) was tantamount to the statutory intentional removal of a safety guard for reasons other than maintenance or repair, and reversed a summary judgment in favor of the employer.
The reasoning in Bailey v. Hogg was this Court's basis for holding in Harris v. Gill, 585 So.2d 831 (Ala. 1991), that the willful and intentional "bypassing" of a safety device designed to prevent injury was conduct "encompassed within the word 'removal' " in § 25-5-11(c)(2). And in Moore v. Reeves,589 So.2d 173 (Ala. 1991), the willful and intentional failure to repair a safety device, after notice of its malfunctioning and after a complaint by the employee that the machine was unsafe, was held to constitute "removal" of a safety device as contemplated by the statute. Additionally, the Moore decision sets out this Court's interpretation of § 25-5-11(c)(2) in the context of defining the statutory term "safety guard or safety device":
 "Therefore, for purposes of construing these terms within § 25-5-11(c)(2), we hold that a 'safety device' or 'safety guard' is that which is provided, principally, but not exclusively, as protection to an employee, which provides some shield between the employee and danger so as to prevent the employee from incurring injury while he is engaged in the performance of the service required of him by the employer: it is not something that is a component part of the machine whose principal purpose is to facilitate or expedite the work."
Moore v. Reeves, 589 So.2d at 177.
Applying the holdings in these three cases to the facts of this case, we hold that the "splitter box," the "transfer lines," and the "ninety-degree elbow joint" are not safety guards or safety devices as contemplated by § 25-5-11(c)(2). Rather, these integral parts of the clarifier system are necessary conduits through which the liquid must travel during the process of making white liquor and were never intended to act as safety mechanisms. Therefore, we affirm that portion of the judgment holding that the "splitter box," the "transfer lines," and the "ninety-degree elbow joint" are not safety devices within the purview of the statute; the trial court correctly entered the summary judgment as to Count 5 of the plaintiffs' complaint.
The trial court also ruled correctly in entering the summary judgment for the defendants on Count 6 of the amended complaint. In Count 6, the plaintiffs alleged that the co-employee defendants willfully and intentionally failed to use every available safety device to determine whether the clarifier was empty after initiating the requested isolation process.
The plaintiffs characterize the evidence before the trial court as including statements by the co-employee defendants and certain nonparty co-employees that 1) components of the clarifier system were meant to be safety devices; 2) some of the actions taken in "isolating" a clarifier for maintenance or repair are taken for safety reasons; and 3) *Page 1062 
according to the employer's own post-accident report, some of the actions that should have been taken, but were not taken, on the date of the accident could have prevented Hallmark's injury. The evidence also included Scott Paper Company's official "Accident Report" of this incident, which contained the following data:
"ROOT CAUSES:
 "• INADEQUATE ISOLATION PROCEDURE — did not verify if tank/line was empty
 "• ABSENCE OF LOCK-OUT PROCEDURE TO WORK SOLELY ON PIPING ISOLATION
". . . .
"CIRCUMSTANCES
 "EXTERIOR LEVEL INDICATOR ON THE SPARE STORAGE TANK IS MONITORED TO CONFIRM TRANSFER. AN ADDITIONAL STEP IN THE PROCEDURE IS FOR THE OPERATOR TO VISUALLY INSPECT THE DISCHARGE SIDE OF THE FEED LINE FOR VERIFICATION OF NO FLOW. IN THIS INSTANCE THE VISUAL INSPECTION WAS NOT ACCOMPLISHED."
The only parts of the clarifier that arguably were safety devices were a lid on the top of the clarifier, a valve on the side, and a valve near the bottom. The co-employee Johnston closed the supply valve, pumped out the clarifier tank until a gauge indicated that no more liquid was flowing, and then closed the output valve to prevent backflow. He then simply did not raise the lid to look into the clarifier to see if it was empty and did not open the valve at the bottom, which would have discharged fluid and thereby shown that the tank was not empty. Defendants Cleveland and Brodbek also had some responsibilities in connection with this procedure, and they also did not inspect the tank to see if it was empty. This is only a failure to verify the results of the isolating and emptying procedures, not an intentional removal of a safety device.
Even accepting that the willful and intentional failure to install a safety device, Bailey v. Hogg, 547 So.2d 498
(Ala. 1989), the willful and intentional bypassing of a safety device by installing an alternative device, Harris v. Gill,585 So.2d 831 (Ala. 1991), or the willful and intentional failure to maintain or repair a safety device after notification of the danger, Moore v. Reeves, 589 So.2d 173 (Ala. 1991), can come within the terms of § 25-5-11(c)(2), the facts of this case do not come within those terms. The three cited cases involved existing safety devices that the defendants knew not to be functioning as intended. In this case, the lid, the side valve, and the bottom valve were not safety devices: they were not a "shield between the employee and danger so as to prevent the employee from incurring injury while he is engaged in the performance of the service required of him by the employer"; rather, they were simply "component part[s] of the machine whose principal purpose [was] to facilitate or expedite the work." Moore, supra, 589 So.2d at 177.
The defendants and other co-employee deponents on a few occasions referred to the bottom valve as a safety valve, but they more often objected to questions characterizing it as such, stating that they did not think of it as a safety device. Most of the evidence cited by the plaintiffs as statements by witnesses that the lid, the bottom valve, or the side valve were safety devices was simply testimony by which the witnesses acknowledged that if the valve had been opened or the lid had been opened, the presence of white liquor could have been detected. Even assuming that they were safety devices, they had not been removed, had not been bypassed so as to prevent their proper functioning, and were fully operational. The co-employees simply did not use them to determine whether the tank had been successfully emptied.
The failure to verify that the tank was empty or to "accomplish" a visual inspection, as cited in the accident report, cannot serve, within the meaning of § 25-5-11(c), as evidence of willful and intentional removal of safety devices. Under such a rule, any negligence that pertains to safety or adds to the plaintiff's risk would be actionable. This is the very result the legislature intended to preclude by the 1985 act from which § 25-5-11(c) *Page 1063 
derives and which was held constitutional in Reed v. Brunson,527 So.2d 102 (Ala. 1988).
Because none of the acts alleged or shown by the evidence in opposition to the summary judgment motion could be said to amount to the intentional removal of a safety device, the plaintiffs made no showing of "willful conduct" within the terms of § 25-5-11(c)(2). Therefore, the summary judgment is also due to be affirmed as to Count 6.
OPINION WITHDRAWN; OPINION SUBSTITUTED; APPLICATION GRANTED; AFFIRMED.
MADDOX, SHORES, ADAMS, HOUSTON, STEAGALL and INGRAM, JJ., concur.
[1] The plaintiff William C. Hallmark claimed damages for personal injury. His wife, Ruby P. Hallmark, claimed damages for loss of consortium. The plaintiffs also sued several corporate defendants, alleging defects in the manufacture, installation, maintenance, repair, and inspection of the equipment involved. Those claims are still pending in the trial court.