PER CURIAM.
Michael and Suzanne Owens filed a complaint in the Circuit Court of Jefferson County against Dr. Thomas Rado, M.D., alleging medical malpractice. The court entered a summary judgment for the defendant. Michael Owens appeals. The issue is whether the circuit court erred in entering the summary judgment for the defendant even though the plaintiffs submitted the affidavit of a similarly situated health care provider who presented an expert opinion that the defendant had breached the applicable standard of care in treating Mr. Owens’s Hodgkin’s Disease.
The Owenses’ complaint alleged that Dr. Rado breached the appropriate standard of care when he did not remove a Hickman catheter[1] from the right side of Mr. Owens’s chest after Mr. Owens complained of pain in the right chest, neck, and arm area following chemotherapy treatment cycles. The area surrounding the Hickman catheter access site hardened and Mr. Owens experienced fibrosis and a substantial reduction in range of motion. Mrs. Owens joined the complaint, alleging a loss of consortium.
The case was set for trial in August 1993. However, the Owenses’ medical liability expert was unavailable, and the circuit court continued the trial and reset it for May 1994. On August 26, 1993, Dr. Rado moved for a summary judgment. In support of his motion for a summary judgment, Dr. Rado submitted his affidavit stating that he did not fall below the applicable standard of care in treating Mr. Owens.
In response to Dr. Rado’s motion, the Ow-enses submitted an affidavit of Dr. Barry L. Singer, M.D., in which Dr. Singer expressed the opinion that Dr. Rado did breach the standard of care. In particular, Dr. Singer’s affidavit presents an opinion that Dr. Rado’s failure to remove the Hickman catheter in response to Mr. Owens’s complaints constituted a breach of the standard of care and proximately caused Mr. Owens’s neck fibrosis.
Dr. Singer’s affidavit reads:
“My name is Barry L. Singer. I reside at 1464 Fort Washington Avenue, Ambler, PA 19002. I am a licensed physician in the state of Pennsylvania. My office address is 1544 DeKalb Street, Norristown, PA 19401. A true and correct copy of my curriculum vitae is attached to this affidavit as Exhibit A. This C.V. accurately sets forth my educational, professional, and medical background and qualifications.
“I am currently licensed to practice medicine in the State of Pennsylvania. I have been trained in and I have very extensive experience in hematology and oncology, the same subspecialties as the defendant in this case, Thomas A. Rado, M.D. I was certified in Internal Medicine by the American Board of Internal Medicine in 1972. I was certified in my subspe-cialty of Hematology by the American Board of Internal Medicine in 1974. I was certified by this same board in my subspe-eialty of Oncology in 1979. I have been actively engaged in the private practice of internal medicine since 1972, hematology since 1974, and oncology since 1979.
“Approximately 80% of my practice is in hematology and oncology. The other 20% consists of general internal medicine. I am the Chief of Hematology and Oncology at Sacred Heart Hospital. I practice in Montgomery Hospital and Suburban hospi- *89 tais. I also have an office practice and see patients at the Norristown Regional Cancer Center. I usually see 8 to 12 patients per day at the hospitals, 10 to 15 patients per hour at my office during my office hours 3 days per week, and 5 or 6 patients at each of my sessions at the cancer center.
“I have previously testified in Alabama on several occasions as an expert in medical negligence cases, and have been repeatedly qualified and accepted by Alabama courts as such an expert. I have also been repeatedly qualified and accepted by other jurisdictions as an expert in medical negligence eases. I have provided expert medical testimony in other jurisdictions by deposition on more than 100 occasions and in trial approximately 50 times.
“I am familiar with the standard of care which applies to Dr. Rado under the facts and circumstances of this case. I know that a breach of the standard of care by Dr. Rado would be his failure to exercise the reasonable care, skill, and diligence as other similarly-situated physicians in the same general line of practice ordinarily have and exercise in a like case.
“I have experience in and knowledge of the treatment of Hodgkin’s disease by radiation therapy. I have experience in and knowledge of the type of radiation therapy received by Michael Owens for the treatment of his Hodgkin’s disease. I have experience in and knowledge of the potential complications of the type of radiation therapy received by Mr. Owens for the treatment of his Hodgkin’s disease.
“I have experience in and knowledge of the treatment of Hodgkin’s disease by chemotherapy. I have experience in and knowledge of the use of Hickman catheters in the treatment of Hodgkin’s disease by chemotherapy. I have experience in and knowledge of the treatment of Hodgkin’s disease by chemotherapy by the use of venous access sites other than Hickman catheters on the right sides of patients’ chests. I have experience in and knowledge of the potential complications of Hickman catheters. I have experience in and knowledge of the type or regimen of chemotherapy provided to Mr. Owens by Dr. Rado. I have experience in and knowledge of the effects of the chemotherapy agents utilized by Dr. Rado for Mr. Owens’ treatments when they come in contact with subcutaneous tissues.
“The opinions I provide in this affidavit are based upon my own education, knowledge, and experience. The facts pertinent to this case which I use to form these opinions come from the deposition testimony of Mr. and Ms. Owens, Dr. Rado, and David L. Hinton, M.D. I also obtained relevant facts from Dr. Rado’s office records, which were attached to his deposition. I also relied in part on the interrogatory answers given by Mr. Owens, Dr. Rado, and Dr. Halpern.
“It is my opinion that the single lumen Hickman catheter, through which Mr. Owens received his chemotherapy for Hodgkin’s disease, caused the leaking of one or more chemical agents into the subcutaneous tissues of his right thorax, which resulted in significant fibrosis and limitation of motion. The evidence reveals that, in spite [of] Mr. Owens’ complaints of pain in connection with the administration of his chemotherapy, Dr. Rado continued the infusions through the existing Hickman catheter site. It is my opinion that Dr. Rado breached the applicable standard of care because Mr. Owens’ symptoms of pain were not properly evaluated or treated by the removal of the Hickman catheter and the substitution of a venous access device in another location. It is my opinion, which is supported by Dr. Hinton’s testimony, that another Hickman catheter could have been placed on the left side of Mr. Owens’ chest. It is further my opinion that another Hickman catheter should have been placed on the left side of Mr. Owens’ chest after the initial one was removed, and the failure to do so constituted a breach of the standard of care.
“It is my opinion that Mr. Owens’ complaints of pain and discomfort subsequent to his chemotherapy treatments were strongly indicative of leakage of the chemotherapy agents from the vein, or a permeation of the vein by the catheter tip, which resulted in these agents entering his *90 subcutaneous tissues. It is my opinion that this leakage into the subcutaneous tissues caused Mr. Owens to experience significant fibrosis to the point where he has lost some mobility and function of his right arm and neck, which in turn causes him considerable distress.
“It is my opinion that when Mr. Owens complained of discomfort in his joints and right shoulder area following the administration of chemotherapy, Dr. Rado breached the standard of care by [not] discontinuing his chemotherapy until a second or alternate venous access line was placed which did not result in these symptoms. The left side of Mr. Owens’ chest was immediately available for another Hickman catheter at that point in time, and if that did not prove satisfactory, then access could be gained in the groin area or the chemotherapy could be given intravenously in the arms. It is my opinion that this interruption in Mr. Owens’ chemotherapy treatments would not be for a substantial period of time and would not substantially affect the administration of his therapy.
“It is my opinion that Dr. Rado breached the standard of care by continuing [to] administer chemotherapy to Mr. Owens through an access site that was causing recurrent symptoms indicative of infiltration, permeation, or thrombosis (clotting). It is my opinion, based upon a reasonable degree of medical certainty, that Mr. Owens’ current problems of fibrosis and limitation of motion were caused by the failure of Dr. Rado to order the removal of the Hickman catheter when these symptoms were presented. It is my opinion, again based upon a reasonable degree of medical certainty, that Mr. Owens’ current problems of fibrosis and limitation of motion were caused by the failure of Dr. Rado to order that another venous access site be used, such as another Hickman catheter on the left side of the chest, when these symptoms were presented.
“It is my opinion that the type of chemotherapy treatments received by Mr. Owens were medically appropriate for his Hodgkin’s disease, and that his disease was successfully treated by the use of this chemotherapy regimen. However, it is my opinion, again based upon a reasonable degree of medical certainty, that this chemotherapy treatment would have also been successful if given through an administration site other than the one which Dr. Rado continued to use in spite of Mr. Owens’ symptoms. The use of such an alternate site would not have caused the fibrosis and limitation of motion from which Mr. Owens now suffers. It is my opinion that Mr. Owens would have been successfully treated for his Hodgkin’s disease if the site of the Hickman catheter had been changed to the left side or another access site had been utilized at the time of or shortly after Mr. Owens presented Dr. Rado with his complaints of pain and discomfort.”
Attached to Dr. Singer’s affidavit was his curriculum vitae:
“Barry L. Singer, M.D.
1464 Fort Washington Avenue
Ambler, Pa. 19002
“Office:
1544 DeKalb Street
Norristown, Pa. 19401
(215) 270-7696
“Education: Harvard College, Cambridge, Massachusetts
B.A. — June, 1963
“Medical College: Johns Hopkins, Baltimore, Maryland
M.D. — June, 1967
“Internship: Bellevue Hospital (NYU Division) NY, NY
July, 1967-June, 1968
Straight Medical
“Residency: Graduate Hospital
University of Pennsylvania
Philadelphia, PA
July, 1968-June 1970
Internal Medicine
“Fellowship: Graduate Hospital
University of Pennsylvania
Philadelphia, PA
July, 1970-June, 1971
Hematology-Oncology
Jerome Brody, M.D. — Preceptor
*91 “Military Service:
U.S. Army Medical Corps
Valley Forge Army Hospital, Phoenixville, PA
July, 1971-June, 1973
Duties: Director of Hematology & Oncology
Trainee — Nuclear Medicine “Board Certification:
American Board of Internal Medicine— June, 1972
Subspecialty — Hematology—October, 1974 Subspecialty — Oncology—June, 1979 “Organizations:
Philadelphia Hematology Society
American Medical Association
Montgomery County Medical Society
American Society of Internal Medicine
American College of Physicians
American Society of Clinical Oncology
“Publications:
Singer, Barry L., Brody, Jerome
American Journal of Medical Sciences—
October, 1972
Cytoxan Therapy of Chronic Lymphocytic
Leukemia — April, 1971
(Presented at Atlantic City Federation Meetings)
“Hospital Affiliations:
Montgomery Hospital
Sacred Heart Hospital
Suburban Hospitals
Chief of Hematology & Oncology — Sacred Heart Hospital
Visiting Nurses Association — Norristown, PA
Norristown Regional Cancer Center”
The circuit court granted Dr. Rado’s motion for summary judgment. The Owenses appeal.
“[Ojrdinarily, in a professional malpractice case, once the defendant offers expert testimony in his behalf (albeit his own opinion), establishing lack of negligence, the defendant is entitled to a summary judgment, unless the plaintiff counters the defendant’s evidence with expert testimony in support of the plaintiffs claim. See, Phillips v. Alonzo, 435 So.2d 1266 (Ala. 1983).”
Swendsen v. Gross, 530 So.2d 764, 768 (Ala. 1988).
Dr. Singer’s qualifications establish him as a “similarly situated health care provider,” Ala.Code 1975, § 6-5-548. His affidavit presents a thorough description of his review of the evidence and his opinion based thereon — that Dr. Rado breached the standard of care and thereby caused Mr. Owens’s neck fibrosis.
Dr. Rado asserts that Dr. Singer’s affidavit does not set forth the facts upon which his opinion is based. Dr. Singer’s affidavit describes the evidence and records he reviewed, all of which were submitted to the circuit court in support of or in opposition to the summary judgment motion. He then gives opinions closely tied to the facts infera-ble from the evidence. For example:
“It is my opinion that Mr. Owens’ complaints of pain and discomfort subsequent to his chemotherapy treatments were strongly indicative of leakage of the chemotherapy agents from the vein, or a permeation of the vein by the catheter tip, which resulted in these agents entering his subcutaneous tissues....
“It is my opinion that when Mr. Owens complained of discomfort in his joints and right shoulder area following the administration of chemotherapy, Dr. Rado breached the standard of care by [not] discontinuing his chemotherapy until a second or alternate venous access line was placed which did not result in these symptoms.”
These and other recitations of fact and opinion in Dr. Singer’s affidavit sufficiently comply with the requirement of Rule 56(e), Ala. R.Civ.P., that affidavits “shall set forth such facts as would be admissible in evidence.”
Dr. Rado further asserts that Dr. Singer’s “deposition indicates that his opinion was based on erroneous facts.” This statement is based on Dr. Rado’s arguments that statements in Dr. Singer’s deposition tend to indicate that a leaking catheter would cause pain immediately at the time of the chemotherapy injections, and that the evidence indicates that Owens did not experience pain immedi *92 ately. The evidence does not automatically lead only to the conclusions Dr. Rado draws. Dr. Rado points to this statement by Dr. Singer in his deposition: “If at the time the drug is administered the patient complains of symptoms one has to think of extravasation or leakage because that would be the only time the drug would cause pain.” Dr. Rado argues that this statement shows that Dr. Singer’s opinion is based upon facts not in evidence. We are unwilling to say, as a matter of law, that this statement by Dr. Singer implies that the pain would be present immediately upon the administration of the drug. Owens received chemotherapy at intervals ranging from a week to a month. “At the time the drug is administered” could, in this context, refer to pain arising within two to three days.
Dr. Rado also offered the following question and answer in Dr. Singer’s deposition as supporting Dr. Rado’s position:
“Q. And the symptoms would be discomfort during the administration of the chemotherapy?
“A. Correct, and later pain or swelling of the arm.”
(Emphasis added.) Although an expert for Dr. Rado stated that a patient will experience pain immediately upon the injection if the catheter is leaking, Dr. Singer never said that. On the contrary, he said, at another point in his deposition:
“I saw symptoms related to the administration of the chemotherapy when the patient complained of pain a few days after the administration, and then the patient had other symptoms related to the swelling of the arm plus eventually the fibrosis of the skin. So my opinion would be that, you know, there was some basis for concern with the placement of the catheter.
"... I don’t think the perforation caused symptoms at the time. It would only cause symptoms after the patient was given a concentrated solution of the chemo and then a few days later complained of pain.”
In short, the evidence is conflicting, and, having reviewed the same evidence relied upon by Dr. Rado and his experts, Dr. Singer unequivocally stated his opinions as set forth in the affidavit and his deposition, as quoted above.
The evidence must e viewed in a light most favorable to the nonmoving party. Lee v. City of Gadsden, 592 So.2d 1036 (Ala. 1992); Hallmark v. Duke, 624 So.2d 1058 (Ala.1993). To enter a summary judgment for Dr. Rado at this point, it would be necessary to make findings regarding disputed facts and, furthermore, in doing that, to view the evidence in the light most favorable to the moving party, Dr. Rado, so as to conclude that Dr. Singer bases his opinion in his affidavit on erroneous facts. A motion for summary judgment should not be granted unless “there is no genuine issue as to any material fact”; thus, a court should not enter a summary judgment if, to enter a judgment, the court must make findings of fact. “On a motion for summary judgment, the trial judge cannot make such factual findings.” Ray v. Midfield Park, Inc., 293 Ala. 609, 612, 308 So.2d 686, 688 (1975); Horton v. Northeast Alabama Regional Medical Ctr., Inc., 334 So.2d 885 (Ala.1976); Ingram v. Akwell Indus., Inc., 406 So.2d 897 (Ala.1981).
Moreover, in a medical malpractice case, even if the facts are undisputed there can be a disagreement between the plaintiffs and the defendant’s expert witnesses as to whether those facts constitute malpractice that proximately caused the plaintiffs injuries. In this case, medical experts have different opinions about whether the defendant breached the standard of care. Because Dr. Singer expressed the opinion that the facts of this case show that Dr. Rado’s treatment of Owens fell below the standard of care and caused Owens’s injury, and because Dr. Singer is eminently qualified to give such an opinion, a jury question is presented.
Therefore, the summary judgment is reversed, and the cause is remanded for further proceedings.
REVERSED AND REMANDED.
ALMON, SHORES, HOUSTON, INGRAM and BUTTS, JJ., concur.
MADDOX, KENNEDY and COOK, JJ., dissent.

. A Hickman catheter is a venous access device that was used, in this case, to administer chemotherapy.