Mary Namislo and her husband, Ricky Namislo, appeal from summary judgments entered in favor of Stauffer Chemical Company, Inc., and Chesebrough-Ponds, Inc., on her claims alleging negligence and wantonness; in favor of several co-employee defendants on her claims of "willful conduct" as defined in § 25-5-11(c)(2), Ala. Code 1975; in favor of co-employee defendants on her claims alleging the tort of outrage; in favor of co-employee Fred Cannon, Akzo Chemical Company, Inc., Stauffer, and Chesebrough-Ponds on her claims of intentional fraud; and in favor of Akzo, Stauffer, and co-employee defendants on her claims of intentional suppression of material facts. We affirm.
Mary Namislo began work for Stauffer Chemical Company in 1976, and she worked at the chlorine production plant until 1992. During that time, the plant was sold to Chesebrough-Ponds. In 1987, Chesebrough-Ponds sold the plant to Akzo.
This is the second time this case has come before this Court. The following rendition of the facts is taken from our opinion in the earlier appeal, Namislo v. Akzo Chemicals, Inc.,620 So.2d 573 (Ala. 1993):
 "During the course of her employment with Akzo Chemicals, Inc., Mary C. Namislo was exposed to mercury. During that employment, she became pregnant with Amber Namislo. As a result of the exposure to mercury, Mary and Amber both suffer from mercury poisoning.
 "Mary and her husband, Ricky E. Namislo, both of them acting individually and as parents and next friends of Amber, sued Akzo Chemicals, several co-employees, and Minnesota Mining and Manufacturing Company, alleging that Akzo Chemicals and the co-employees had negligently and wantonly caused the mercury poisoning and had negligently failed to warn the Namislos that the mercury created a dangerous condition at the plant. The Namislos also alleged fraud on the part of Akzo Chemicals and the co-employees, and they alleged the tort of outrage and 'willful conduct' (as defined under the Alabama Workers' Compensation Act — see Ala. Code 1975, § 25-5-11(c)) — against the co-employees. Ricky's claims were for Amber's medical expenses, loss of Amber's services, and loss of consortium. Mary's claims against Akzo Chemicals were for Amber's medical expenses and loss of Amber's services; Mary's claims against the co-employees were for Amber's medical expenses, loss of Amber's services, and her own personal injuries. The claim against Minnesota Mining and Manufacturing Company was based on the Alabama Extended Manufacturer's Liability Doctrine, but that claim is unrelated to the issues in this appeal.
 "The trial court dismissed all of the claims against Akzo Chemicals and all claims against the co-employees except for the willful conduct claims."
620 So.2d at 574. This Court reversed and remanded, stating:
 "We agree with the Thompson [v. Pizza Hut of America, Inc., 767 F. Supp. 916 (N.D.Ill. 1991),] court and hold that the Alabama Workers' Compensation Act, like the Illinois Workers' Compensation Act, does not alter an employer's liability to nonemployees [such as Amber] who are injured as a result of the employer's alleged negligence. Likewise, we hold that the exclusivity provisions of the Alabama Workers' Compensation Act do not bar the Namislos' fraud claims against Akzo Chemicals and do not bar Amber's claims against the co-employees based on fraud, outrage, negligence, and wantonness or Mary's or Ricky's claims against the co-employees for Amber's medical expenses and loss of Amber's services. The trial court's judgment is reversed and this cause is remanded for further proceedings."
620 So.2d at 575. (Footnote omitted.) On remand, the trial court entered a summary *Page 1383 
judgment for Stauffer and Chesebrough-Ponds on Namislo's claims of negligence and wantonness; in favor of the co-employee defendants on Namislo's claims of "willful conduct" pursuant to § 25-5-11(c)(2) and the tort of outrage; in favor of Akzo, Stauffer, Chesebrough-Ponds, and co-employee Fred Cannon on Namislo's claim alleging intentional fraud; and in favor of Akzo, Stauffer, and the co-employee defendants on Namislo's claim alleging intentional suppression of material facts.
Namislo appeals, contending that the trial court erred in entering the summary judgment on her "willful" conduct claims, because, she says, the trial court incorrectly held that the exclusivity provisions of § 25-5-114 barred her claims.
Our earlier opinion stated that Namislo "suffer[s] from mercury poisoning." Actually, she alleges that she does, but whether in fact she does is disputed. It is not contested by the parties that mercury was used at the chlorine production plant where Namislo worked, nor that, if she does in fact have mercury poisoning, she contracted it at her workplace. Section25-5-110 defines an "occupational disease" as follows:
 "(1) OCCUPATIONAL DISEASE. A disease arising out of and in the course of employment, including occupational pneumoconiosis and occupational exposure to radiation as defined in subdivisions (2) and (3), respectively, of this section, which is due to hazards in excess of those ordinarily incident to employment in general and is peculiar to the occupation in which the employee is engaged but without regard to negligence or fault, if any, of the employer. . . ."
Occupational diseases are the subject of Article 4 of the Workers' Compensation Act. Article 4, in pertinent part, states as follows:
 "The rights and remedies granted in this article shall exclude all other rights and remedies of an employee, his personal representative, parent, surviving spouse, dependents or next of kin, at common law, by statute, contract or otherwise on account of the contraction of an occupational disease, as defined in this article, and on account of any injury, disability, loss of service or death resulting from an occupational disease, as defined in this article. Except as provided in this article, no employer included within the terms of this chapter and no officer, director, agent, servant or employee of such employer shall be held civilly liable for the contraction of an occupational disease, as defined in this article, or for injury, disability, loss of service or death of any employee due to an occupational disease while engaged in the service or business of the employer, the cause of which occupational disease originates in the employment; but nothing in this section shall be construed to relieve any person from criminal prosecution for failure or neglect to perform any duty imposed by law. The immunity from civil liability shall extend to any workers' compensation insurance carrier of such employer and to any officer, director, agent, servant or employee of such carrier, and such immunity shall further extend to any labor union, or any official or representative thereof, making a safety inspection for the benefit of the employer or the employees."
Section 25-5-114, Ala. Code 1975. Portions of the remainder of the Workers' Compensation Act are applicable to occupational diseases via the language of § 25-5-123, which states:
 "All of the provisions of Articles 1, 2, 3 and 8 of this chapter, except Section 25-5-78, shall be applicable to this article, unless otherwise provided or inconsistent herewith."
This Court must determine whether the language in Article 4, and in particular § 25-5-114, set forth above, precludes Namislo's action brought pursuant to § 25-5-11.
While § 25-5-114 seems to exclude all causes of action against co-employees, the wording of § 25-5-11 and Alabama case law indicate that this Court has recognized claims brought under § 25-5-11 for occupational diseases. First, § 25-5-11
makes specific provision for such a cause of action: *Page 1384 
 "(a) If the injury or death for which compensation is payable under Articles 3 or 4 of this chapter was caused under circumstances also
creating a legal liability for damages on the part of any party other than the employer, whether or not the party is subject to this chapter, the employee, or his or her dependents in case of death, may proceed against the employer to recover compensation under this chapter or may agree with the employer upon the compensation payable under this chapter, and at the same time, may bring an action against the other party to recover damages for the injury or death, and the amount of the damages shall be ascertained and determined without regard to this chapter. . . ."
The legislature specifically stated that § 25-5-11 would be applicable to Article 4. If § 25-5-114 is interpreted literally, the language in § 25-5-11 referencing Article 4 would have no meaning whatever.
In addition to the Code section, Alabama case law indicates that there is such a cause of action. The plaintiffs rely heavily on Grimes v. Stewart, 628 So.2d 467, 468 (Ala. 1993), to support their argument that Ms. Namislo has a cause of action against the co-employee defendants in this case. In Grimes, Brian Ray Stewart sued former co-employees under §25-5-11(c)(1), alleging that he had contracted leukemia from breathing the fumes of gasoline-contaminated soil and that his co-employees had intended his injury. Id., 628 So.2d at 467. This Court reversed a $7,000,000 judgment[1] in favor of Stewart, finding no evidence to support Stewart's allegation that the co-employee defendants had intended that he contract leukemia or had known with substantial certainty that he would. Id., at 469. Although the judgment in Grimes was reversed because of a lack of evidence of willful conduct, the following language inGrimes supports Namislo's argument that the exclusivity provisions of Article 4 of the Workers' Compensation Act do not apply under the facts of this case:
"Section 25-5-11(b) provides in pertinent part:
 " 'If personal injury [which includes an occupational disease, § 25-5-1(9)] or death to an employee results from the willful conduct, as defined in subsection (c) herein, of any . . . employee of the same employer . . . the employee shall have a cause of action against the person. . . .' "
Grimes, supra, at 468. Clearly, Grimes impliedly recognizes what was specifically stated by this Court in Hubbard v.Liberty Mutual Insurance Co., 599 So.2d 20 (Ala. 1992). InHubbard, this Court was faced with a statute of limitations question when Hubbard, who suffered from an occupational disease, filed a co-employee action pursuant to § 25-5-11. Hubbard, who conceded that he had missed the deadline imposed by § 6-2-38(g) for filing his action, argued that the provisions of § 25-5-117 tolled the statute of limitations for his action. This Court stated in Hubbard:
 "This Court has held that a claim filed pursuant to § 25-5-11, as these claims were, is a tort action for damages, and is not a claim for workman's compensation benefits. In Johnson v. Asphalt Hot Mix, 565 So.2d 219 (Ala. 1990), this Court specifically held as follows:
 " 'An action against third parties or co-employees as allowed by § 25-5-11 is not a claim for Workmen's Compensation, but is a tort action for damages that is removed from the exclusive remedy provisions of §§ 25-5-52 and -53 by virtue of the exceptions set forth in § 25-5-11. Section 25-5-11(a) begins, "Where the injury or death for which compensation is payable under this chapter was caused under circumstances also creating a legal liability for damages on the part of any party other than *Page 1385 
the employer" (emphasis added [in Johnson]). Thus, under the very terms of § 25-5-11, an action allowed by that section is a legal action for damages, not a claim for compensation "payable under this chapter," i.e., it is not "a claim for Workmen's Compensation." See, also, § 25-5-11(1) for the definition of "compensation" and § 25-5-51, setting forth the right to such compensation.' "
Johnson, 565 So.2d at 220-21.
 We believe that the Legislature intended to uphold the distinction between third-party tort actions (§ 25-5-11) and worker's compensation claims (§ 25-5-117). Consequently, we hold that the provisions of § 25-5-117 are applicable only to worker's compensation claims, and are not applicable to tort suits filed pursuant to the provisions of § 25-5-11. The brief filed by the co-employee defendants gives an example of the necessity of making the distinction between the two types of claims:
 " 'An employee contracts an occupational disease due to his work environment and is permanently, totally disabled. His employer's worker's compensation carrier pays him benefits for twenty years following his injury and then, for whatever reason, decides to cease making payments. The logical conclusion of the plaintiffs' argument, in the case at bar, is that a co-employee suit could be filed within twenty-one years of the date of the plaintiffs injury.'
 Because the Hubbards' suit was filed more than two years after Tommy Hubbard was last exposed, their claims were barred by the provisions of § 6-2-38(g); and the tolling provisions of § 25-5-117
do not apply to these tort claims filed pursuant to the provisions of § 25-5-11."
599 So.2d at 22. Based on Grimes and Hubbard, this Court reaffirms that an employee with an occupational disease can sue co-employees for "willful conduct."
The question then becomes whether Namislo offered substantial evidence to withstand a properly supported motion for summary judgment on behalf of the co-employee defendants under the facts of this case. Section 25-5-11(b) states:
 "(b) If personal injury or death to any employee results from the willful conduct, as defined in subsection (c) herein, of any officer, director, agent, or employee of the same employer or any workers' compensation insurance carrier of the employer or any person, firm, association, trust, fund, or corporation responsible for servicing any payment of workers' compensation claims for the employer, or any officer, director, agent, or employee of the carrier, person, firm, association, trust, fund, or corporation, or of a labor union, or an official or representative thereof, the employee shall have a cause of action against the person, workers' compensation carrier, or labor union."
Specifically, Namislo, who contends that the co-employee defendants removed safety devices from machines, must offer substantial evidence of "willful conduct" as defined in §25-5-11(c)(2). "Substantial evidence" is "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co.of Florida, 547 So.2d 870, 871 (Ala. 1989).
Section 25-5-11(c)(2) defines "willful conduct" to include the following:
 "(2) The willful and intentional removal from a machine of a safety guard or safety device provided by the manufacturer of the machine with knowledge that injury or death would likely or probably result from the removal; provided, however, that removal of a guard or device shall not be willful conduct unless the removal did, in fact, increase the danger in the use of the machine and was not done for the purpose of repair of the machine or was not part of an improvement or modification of the machine which rendered the safety device unnecessary or ineffective."
Namislo contends that when she worked at the chemical plant, she spent much of her *Page 1386 
time cleaning the "cell house." The cell house is the structure in the plant where chlorine gas is produced. The production of chlorine gas requires the use of mercury as an electrode to generate chlorine gas from brine. Namislo argues that a ventilation system in the cell house known as a scrubber system, the cell house exhaust fans, and a respirator were all "safety devices" or "safety guards" to protect her from exposure to excessive amounts of mercury. Her co-employees' failure to maintain these safety devices, she argues, resulted in her overexposure to mercury and her ultimate injury.
First, we will address Namislo's argument that the scrubber system and the exhaust fans were "safety devices" within the meaning of § 25-5-11(c)(2). In Mallisham v. Kiker,630 So.2d 420 (Ala. 1993), this Court considered whether the failure to place support timbers in a mine shaft constituted the "removal of a safety device." In determining that the timbers did not constitute "safety devices" within the meaning of the statute, this Court stated:
 "The legislature has retained a limited right of action against a co-employee under § 25-5-11(c)(2) for the removal of a manufacturer's safety device from a machine, not the removal or omission of any safety device from any workplace environment. Such a change in the law must be left to the legislature."
630 So.2d at 423-24.
Namislo claims are similar to the claims of James Curtis Layne, who sued co-employees after injuring himself while wading through an accumulation of water on the floor of a mine. See generally, Layne v. Carr, 631 So.2d 978 (Ala. 1994). He sued his co-employees, claiming the water should have been removed by a pump that had at one time been used to pump water from the very spot where he fell. Layne, supra, at 980. In Layne, we wrote:
 "Layne next argues that the defendants' conduct constituted willful conduct under § 25-5-11(c)(2), which defines 'willful conduct' to include the 'willful and intentional removal from a machine of a safety guard or safety device.' Layne acknowledges that the facts of this case are somewhat different from those of the typical cases involving safety guards removed from a machine in a factory setting. However, Layne argues that our construction of § 25-5-11(c)(2) in recent cases is such that it would cover the facts of this case. In Bailey v. Hogg, 547 So.2d 498, 500 (Ala. 1989), for instance, we held that the intentional and willful failure to install a safety guard equated with the intentional and willful removal of a safety guard for the purposes of subsection (c)(2). In Harris v. Gill, 585 So.2d 831, 839 (Ala. 1991), we held that the bypassing of a safety device constituted the removal of a safety device for purposes of subsection (c)(2). In Moore v. Reeves, 589 So.2d 173, 178-79 (Ala. 1991), we held that the failure to maintain or repair a safety guard or device was tantamount to the removal of, or failure to install, a safety guard or device.
 "Section 25-5-11(c)(2) cannot be construed to allow a co-employee action in every situation where an employee is injured on the job. The legislature expressly limited exceptions to the exclusivity of the workers' compensation scheme. We recognized this in Mallisham v. Kiker, 630 So.2d 420 (Ala. 1993), where the plaintiff in a co-employee action under § 25-5-11(c)(2) argued that mining safety is not as concerned with machines as manufacturing safety is, and that, therefore, § 25-5-11(c)(2) should be extended, in the mining context, to include devices pertaining to the safety of the mine itself. 630 So.2d at 423. In rejecting the plaintiffs arguments in Mallisham, we said:
 " 'The legislature has retained a limited right of action against a co-employee under § 25-5-11(c)(2) for the removal of a manufacturer's safety device from a machine, not the removal or omission of any safety device from any workplace environment. Such a change in the law must be left to the legislature.'
 630 So.2d at 423-24. (Emphasis original; footnote omitted.) In Mallisham the *Page 1387 
plaintiff argued that work had continued in a mine shaft in which the 'ribs,' beams supporting the walls and the roof of the mine, had not been placed at the required intervals. Because the ribs were not placed at the required intervals, a boulder rolled from the mine wall and injured the plaintiff. We affirmed the trial court's holding that the timbers that make up the ribs are not a part of a machine. We said in Mallisham that a mine was not a machine, and, therefore, that the failure to install the ribs was not a failure to install a safety device on a machine.
 "We hold that the failure to repair the pump or to improve its pumping capacity to keep the mine free of water is not the equivalent of the failure to repair a safety device on a machine, and, therefore, does not constitute 'willful conduct' under § 25-5-11(c)(2)."
631 So.2d at 982-83.
Likewise, in Hallmark v. Duke, 624 So.2d 1058 (Ala. 1993), this Court considered the question whether the "splitter box," "transfer lines," and the "ninety-degree elbow joint" of a clarifier were "safety guards" or "safety devices" within the meaning of § 25-5-11(c)(2). We stated:
 "[W]e hold that the 'splitter box,' the 'transfer lines,' and the 'ninety-degree elbow joint' are not safety guards or safety devices as contemplated by § 25-5-11(c)(2). Rather, these integral parts of the clarifier system are necessary conduits through which the liquid must travel during the process of making white liquor and were never intended to act as safety mechanisms."
624 So.2d at 1061.
While Namislo would have this Court hold the scrubber system to be a "safety device" or a "safety guard" related to the cell house, our review of the record indicates that the scrubber system and the exhaust fans were not "safety devices" within the meaning of § 25-5-11(c)(2). The purpose of the scrubber system was to maintain a vacuum in the cell. The fans operated to provide ventilation to the cell. While both were part of the system used to produce chlorine, they were not "safety devices" within the contemplation of the statute.
Namislo next contends that the respirator given to her to use when she worked in the cell house was equipped with the wrong filters. She contends that the respirator was a machine and that co-employees failed to equip the respirator with the appropriate filters. She claims that the filters constituted "safety devices" within the meaning of § 25-5-11(c)(2). Again, we note the following language in Mallisham v. Kiker, 630 So.2d at 423-24:
 "[The plaintiff] argues that mining safety is not as concerned with machines as manufacturing safety is, and that § 25-5-11(c)(2) should be extended in the mining context to devices pertaining to the safety of the mine itself. However, such a construction of § 25-5-11(c)(2) would not reasonably conform to the terms of the statute. The legislature has retained a limited right of action against a co-employee under § 25-5-11(c)(2) for the removal of a manufacturer's safety device from a machine, not the removal or omission of any safety device from any workplace environment. Such a change in the law must be left to the legislature."
(Emphasis on "machine" original; other emphasis added.) In the case before us, the respirator itself was a device to be utilized to increase safety in the workplace. Nothing was removed from the respirator by the co-employee defendants; rather, Namislo contends that the filter cartridge to be usedwith the respirator was not properly matched. The respirator simply does not fall within the purview of § 25-5-11(c)(2).
Next, Namislo contends that she should be allowed to maintain her claims against Stauffer and Chesebrough-Ponds alleging negligence and wantonness because she is no longer employed by them and the effects of their actions lingered after they sold their interests in the chlorine production plant.
Section 25-5-116 states: *Page 1388 
 "(a) If compensation is payable for an occupational disease other than pneumoconiosis or radiation, the only employer liable, if any, shall be the employer in whose employment the employee was last exposed to the hazards of the disease. The employer who is liable shall not be entitled to contribution from any other employer of the employee except one who furnished workers' compensation for the employee during the employment of last exposure."
In holding that Namislo does not have a cause of action against her former employers, we take specific note of the following language in Layne v. Carr, supra:
 "The legislative intent regarding co-employee actions is stated in § 25-5-14:
 " 'The legislature finds that actions filed on behalf of injured employees against [officers, directors, agents, servants or] employees of the same employer seeking to recover damages in excess of amounts received or receivable from the employer under the workers' compensation statutes of this state [and predicated upon claimed negligent or wanton conduct resulting in injuries arising out of and in the course of employment] are contrary to the intent of the legislature in adopting a comprehensive workers' compensation scheme and are producing a debilitating and adverse effect upon efforts to retain existing, and to attract new industry to this state. . . . The existence of such causes of action has a disruptive effect upon the relationship among employees and supervisory and management personnel. . . . The intent of the legislature is to provide complete immunity to employers and limited immunity to officers, directors, agents, servants or employees of the same employer . . ., from civil liability for all causes of action except those based on willful conduct and such immunity is an essential aspect of the workers' compensation scheme. The legislature hereby expressly reaffirms its intent . . . regarding the exclusivity of the rights and remedies of an injured employee, except as provided for herein.' The legislature intended that an action be available for persons injured by co-employees, but it intended that an action against co-employees be limited to situations involving 'willful conduct.' The legislature set out three situations where, absent direct proof of an intent to injure, a co-employee's actions would be deemed to be 'willful conduct.' Those situations are set out in § 25-5-11(c)(2), (c)(3), and (c)(4)."
Layne, supra, 631 So.2d at 981-82. (Emphasis added.) The statute specifically provides immunity for former employers for negligent and/or wanton conduct.
We now turn to Namislo's claim against her co-employee defendants alleging outrage; her claim against Akzo, Stauffer, Chesebrough-Ponds, and co-employee Fred Cannon alleging intentional fraud; and her claim against Akzo, Stauffer, and the co-employee defendants alleging intentional suppression of a material fact. First, we note that intentional torts have been recognized by this Court to fall outside the exclusivity provisions of the Workers' Compensation Act. In Lowman v.Piedmont Exec. Shirt Manufacturing Co., 547 So.2d 90 (Ala. 1989), we stated:
 "Because, by this opinion, we recognize that intentional tortious conduct (i.e., intentional fraud) committed beyond the bounds of the employer's proper role is actionable, we deem it appropriate to address the standard of proof to be applied in determining whether a claim is due to be presented to a jury. In order to insure against borderline or frivolous claims, we believe, in view of the exclusivity clause, that a plaintiff, in order to go to the jury on a claim, must make a stronger showing than that required by the 'substantial evidence rule' as it applies to the establishment of jury issues in regard to tort claims generally. See Code 1975, § 12-21-12. Therefore, we hold that in regard to a fraud claim against an employer, a fellow employee, or an employer's insurer, in order to present a claim to the jury, the plaintiff must present evidence that, if accepted and believed by the jury, would *Page 1389 
qualify as clear and convincing proof of fraud."
547 So.2d at 95. Namislo contends that the defendants knew she was being exposed to harmful amounts of mercury and that they fraudulently led her to believe that there was no risk should she become pregnant. Namislo testified in her deposition:
 "Can you tell me, ma'am, the details of that conversation [with Fred Cannon] that occurred on that specific occasion in 1980?
 "A. I am not sure that it was in 1980, it was around 1980, roughly. The control room was full of people. All I know is someone had told me, and I don't remember who, that women shouldn't work in there if they could have children. And I asked the question, and he said that as long as we wore our proper protective equipment, there was nothing to worry about, we were not exposed to high enough levels, and that was it. There was about ten people in there that heard it.
". . . .
 "Q. Let me ask you this, Mary: Are you aware of any proof that exists that Mr. Cannon knew that he was making a false statement to you when he made this alleged statement to you?
 "A. Well, I don't know what proof Akzo managed to read, obtain and abide by in the running of their facility.
"Q. You don't know what Mr. Cannon read, do you?
"A. I certainly do not."
R.T. at 683-84; 686. Under the authority of Lowman, Namislo had to offer evidence of intentional suppression a material fact and fraud that, if believed, would constitute clear andconvincing evidence of fraud. Lowman, supra, at 95. The only evidence offered by Namislo in support of her claim was the deposition testimony of Steve Powe, who stated that in Europe women of child-bearing age were not allowed to work in a cell house. There is no evidence that Cannon, at the time he made the representation, knew Namislo should not be working in the cell house.
With regard to the tort of outrage, we stated inLowman, 547 So.2d at 95:
 "[I]n carving out this exception for allowing intentional tort claims against the employer and fellow employees, we are constrained, in accommodation to the exclusivity provisions of the Act, to rule out all questionable claims. . . .
". . . .
 ". . . [B]ecause the record does not contain sufficient evidence to indicate that the defendants' actions in handling [the plaintiff's] claim were 'so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society,' American Road Service Co. v. Inmon, 394 So.2d [361] at 365 [(Ala. 1980)]; and Nabors v. St. Paul Ins. Co., 489 So.2d 573 (Ala. 1986), summary judgment in favor of Piedmont and Ms. Hart was proper on the tort of outrage claim."
The same must be said under the facts of this case. There is simply no evidence "that the defendants' actions in handling [Namislo's] claim were 'so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.' " Id. at 95 (citations omitted).
Based on the foregoing, the summary judgment is affirmed.
AFFIRMED.
MADDOX, SHORES, HOUSTON, and INGRAM, JJ., concur.
BUTTS, J., dissents.
[1] The jury verdict was actually for $5,250,000 in compensatory damages and $3,000,000 in punitive damages. The trial court remitted $1,250,000 of the punitive damages award, leaving an award of $7,000,000. Grimes, at 468. *Page 1390