SMITH, Justice.
This wrongful-death action arises out of a single-engine aircraft crash in which John E. Swanstrom, Jr. (“Swanstrom”), was fatally injured. Swanstrom’s son, John 0. Swanstrom, individually and as personal representative of Swanstrom’s estate, filed this action in the Mobile Circuit Court against the manufacturers of the aircraft, Cirrus Industries, Inc., and Cirrus Design Corporation (collectively “Cirrus”), and the manufacturers of the engine and the fuel pump of the aircraft, Teledyne Continental Motors, Inc., and Teledyne Technologies, Inc. (collectively “Tele-dyne”). The complaint was later amended to include as plaintiffs Swanstrom’s wife, Patricia M. Swanstrom, and his daughters, Sally A. Swanstrom and Jennifer J. Swan-strom.
John 0. Swanstrom, Patricia M. Swan-strom, Sally A. Swanstrom, and Jennifer J. Swanstrom (collectively “the plaintiffs”) appeal from a summary judgment entered in favor of Teledyne and Cirrus. We affirm in part and reverse in part.

Facts and Procedural History

Swanstrom was killed when the aircraft he was piloting crashed in Angel Fire, New Mexico, on May 28, 2002. At the time of the crash, Swanstrom was the pilot and sole occupant of a single-engine Cirrus SR-20 aircraft (“the aircraft”). The aircraft is described in the record as a lightweight, two-passenger, propeller-driven composite airplane with a Teledyne 10-360-ES piston-driven engine and a Tele-dyne engine-driven fuel pump. Swan-strom was a veteran Minnesota Air National Guard pilot who, with four other individuals, had purchased the aircraft from Cirrus on March 29, 2001.
On the day of the crash, May 28, 2002, Swanstrom was en route from Phoenix, Arizona, to Duluth, Minnesota. After departing from Phoenix, Swanstrom landed at the airport in Angel Fire, New Mexico, to have lunch and to refuel the aircraft. Angel Fire is a village located in the Mor-reno Valley, approximately 150 miles northeast of Albuquerque, New Mexico. The Angel Fire airport is located at an elevation of 8,320 feet above sea level, and it is surrounded by mountainous terrain to *569 the east and west and flat terrain to the north.
After Swanstrom had refueled his aircraft, he taxied onto the runway and radioed for the current temperature. Swan-strom then lifted off without any apparent difficulty and headed north from the Angel Fire airport. Approximately four to five minutes into the flight, Swanstrom crashed in a heavily wooded area. Swanstrom’s aircraft was fully fueled at the time of the crash, and an explosion and ground fire followed the impact.
Jim Barron witnessed almost the entirety of Swanstrom’s flight from the Angel Fire airport. Barron died before his deposition could be taken in connection with this case, but the National Transportation Safety Board (“NTSB”) investigated the crash,[1] and Barron provided the NTSB with the following statement:
“I noticed a small white plane doing its run-up in preparation for take-off from the south end of the runway. I proceeded north on Hwy 434 to Hwy 64 then northeast. As I approached DAV Memorial the white plane flew over me so low that it got my attention. I watched the plane as I traveled north, and then east on County Rd B-36. The plane seemed to be having trouble gaining altitude. I was a short distance from my home when the plane flew by my house and within seconds I saw black billowing smoke.”
Craig Carpenter also witnessed Swan-strom’s flight. Carpenter died before the plaintiffs commenced this action, but he provided the NTSB with the following statement:
“I was working in my shop with the back door open, when I heard an airplane flying overhead. At first I thought it was Gene Hunt’s ultra light but it sounded funny, so I stepped out the back door and looked up at the plane, it was a small whitish plane. It seemed to be missing or running eradi-cally [sic], maybe like spuddering [sic], it was headed south. I went back to work thinking the plane needed a tune-up or something.”
Matthew Brooks also observed Swan-strom’s flight. In a deposition, Brooks testified as follows:
“It was about 4:30 p.m. when the plane was flying really low at a relatively slow speed. I turned around to watch as it flew over my head. As it was trying to climb the mountain — or as it flew over my head, as it was trying to climb the mountain. As it was flying parallel the plane seemed to sound like any other plane would, but as it came closer to the mountains and trees it tried to elevate higher than what it was when it flew over me. At that point, the plane got louder with every second, then started to sputter as it was trying to elevate higher. As I was watching it, it seemed as if the plane was not gaining any elevation and was flying about the same height as it when — as it was when it passed me. When I was still watching it, it made — it made it over the hill in front of me and not a second later, went quiet. After the plane had hit the mountain, there was a moment of silence, I’d say one, two second pause before the explosion.”
The day after the crash, May 29, 2002, Swanstrom’s body was retrieved from the crash site and taken to the Office of the *570 Medical Investigator for the State of New Mexico. Dr. Rebecca Irvine performed an autopsy on Swanstrom on May 30, 2002, and concluded that Swanstrom had died of multiple blunt-force injuries. Dr. Irvine reported that the “autopsy revealed massively charred remains with multiple fractures of the skull, extremities and ribs.... There was no appreciable soot within the airways, where intact, indicating that the pilot was most likely dead at the time of the thermal injuries.” Dr. Irvine also reported that the carbon-monoxide level in Swanstrom’s blood could not be obtained because of the viscosity of his blood.
As part of the NTSB’s investigation of the crash, the New Mexico Office of the Medical Investigator placed blood and tissue samples taken from Swanstrom’s body in a Federal Aviation Administration (“FAA”) toxicology kit and mailed the kit to a FAA laboratory in Oklahoma City, Oklahoma. Dr. Irvine testified that “[t]he kit comes with instructions, and we do our best to fulfill those instructions. We always collect our own materials first for toxicology, however. And then we try to give [the FAA] everything that they ask for, according to their directions.” The FAA received the toxicology kit on June 7, 2002, and, on July 30, 2002, it published the results of its tests in a “Final Forensic Toxicology Fatal Accident Report” (“the toxicology report”).
The FAA reported elevated levels of carbon monoxide and cyanide in the blood sample taken from Swanstrom. The FAA does not report the presence of carbon monoxide when levels are 10 percent or less, and the FAA reported that the carbon-monoxide level in Swanstrom’s blood sample was 12 percent. The toxicology report also stated that “[njormal blood cyanide concentrations are less than .15 ug/ ml, while lethal concentrations are greater than 3 ug/ml,” and that the level of cyanide in Swanstrom’s blood was .98 ug/ml.
The NTSB completed its investigation of the crash and issued a “Factual Report” stating that its examination of the wreckage of the aircraft at the crash site, as well as the examination of the engine of the aircraft at a Teledyne facility, revealed no mechanical or structural anomalies that had contributed to the crash. The report also states that the NTSB “Investigator-In-Charge” calculated the density altitude at the site of the crash to be 11,807 feet mean sea level. The report states that Cirrus reported that at such a density altitude the takeoff rate of climb of the aircraft would have been reduced from its standard 920 feet per minute to 406 feet per minute. Cirrus states that the climb rate decreases because the low volume of air at high-density altitudes provides less oxygen for the combustion-powered piston-driven engines like the one in the aircraft.
On March 8, 2004, John O. Swan-strom sued Teledyne and Cirrus in the Mobile Circuit Court alleging that Swan-strom’s accident had resulted from engine failure.[2] The complaint alleged that Tele-dyne’s and Cirrus’s negligence resulted in “engine and/or other aircraft system malfunction or failure” that caused the crash. The complaint asserted that Teledyne’s *571 negligence included, but was not limited to, its “negligent failure to properly” design, manufacture, test, inspect, build, construct, assemble, and install the “engine and its component parts, specifically including the engine-driven fuel pump,” and its negligent failure to “warn of previous in-flight problems with the engine-driven fuel pump.” As to Cirrus, the complaint alleged that its negligence included, but was not limited to, its “negligent failure to properly” design, manufacture, build, construct, assemble, install, test, and inspect the aircraft.
The complaint further alleged that Cirrus had breached express and implied warranties to Swanstrom and other foreseeable purchasers of the aircraft. Those alleged warranties included a warranty that the aircraft was free of defects, safe, airworthy, and reasonably fit for its intended and foreseeable use and purpose. The complaint alleged that Cirrus breached those express and implied warranties when it designed, manufactured, tested, inspected, assembled, sold, and released into the stream of commerce an aircraft it knew or reasonably should have known was “(a) not airworthy; (b) defective; (c) dangerous and not otherwise fit for its intended use and purpose; (d) not of merchantable quality; [and] (e) an unreasonable risk of harm to consumers.”
Lastly, the complaint alleged that Tele-dyne and Cirrus were strictly liable for Swanstrom’s death because the engine, the fuel pump, and the aircraft were defective and unreasonably dangerous.
The plaintiffs retained Donald Sommer as an aviation-accident-reconstruction expert and professional engineer, and Richard McSwain, Ph.D, as a metallurgy expert and professional engineer, to investigate the cause of the crash. As part of their investigation, Sommer and McSwain examined the wreckage of the aircraft and. disassembled the fuel pump after the NTSB had completed its investigation. In February 2006, Sommer and McSwain each submitted a report stating that the fuel pump had failed during Swanstrom’s flight. McSwain, in his report, described the fuel pump as follows:
“The fuel pump is assembled with five segments connected by thru-bolts. The segments are the fuel pump adapter, the insulator, the body assembly, the vapor assembly and the relief valve cover assembly. ... The thru-bolts pass from the relief valve cover assembly and thread into the fuel pump adapter. The thru-bolts are installed with back-to-back Belleville washers under the heads to maintain clamp-up of the pump segments.”
McSwain reported that the fuel pump “was found with loose pump segments subsequent to the accident” and that it had “evidence of fuel leakage at the pump body-to-vapor separator assembly interface.” McSwain concluded that leakage from the fuel pump was the “result of [the] compression set of the polymeric materials between the pump segments, and resulting loss of clamp-up, and either inadequate assembly torque or the inability of the pump thru-bolts and Belleville washers to take up the loss of clamp-up force.” McSwain further concluded that the fuel pump was
“defective as-assembled in that the thru-blot and Belleville washer assembly was incapable of taking up the loss of clamp-up forces that resulted from the compression set of the polymeric materials located between the pump segments and the lack of any [Teledyne] procedure in place to require periodic retorqueing [sic] of the subject type pump thru-bolts to maintain pump assembly clamp-up.”
*572 Sommer, in his report, also concluded that “[t]he components of the engine driven fuel pump loosened allowing leakage of fuel from the pump into the engine compartment. This fuel leakage resulted in an in-flight engine fire. The in-flight fire combined with the loss of engine power distracted the pilot, causing the crash.” Sommer further concluded that the failure of the fuel pump “occurred due to improper assembly at the [Teledyne] factory or loosening of assembly components subsequent to leaving [Teledyne].”
In April 2006, McSwain supplemented his initial report to add his observations and conclusions from a “component inspection” he had attended at a company known as “Materials Analysis, Inc.,” on April 17-18, 2006, as well as his own exemplar testing on the engine and the fuel pump. McSwain reported that additional analysis of the engine and the fuel pump indicated that the “right external side of the oil sump exhibited heat damage and evidence of forward to rear hot gas flow and surface deposit burning in an area just aft the engine-driven fuel pump, consistent with an in-flight fuel fire.” McSwain further reported that the “induction tube melting showed flow patterns and thinning of the tubes that resulted from front to rear air flow indicative of an in-flight fire.” McSwain concluded his supplemental report by stating that the “engine right side heat damage and residue burning and induction tube melting was the result of an in-flight fire caused by the leaking fuel pump.”
In July 2006, Sommer also supplemented his initial report after attending the inspection of the engine and fuel pump at Materials Analysis, Inc. Sommer added the following observations and conclusions:
“There were signatures on the intake manifold that were indicative of an inflight fire emanating from the forward right hand side of the engine.
“There were soot patterns on the oil sump, right hand cylinder bases, and right hand engine case half that were consistent with an in-flight fire on the right hand forward side of the engine.
“Markings were discovered on the inside of the oil pan that were consistent with the engine being in a more or less uptight position during the post impact fire.
“The cabin heat mixing valve was in a condition that would have allowed products of combustion to pass from the engine compartment to the passenger compartment of the aircraft.”
Over the next two years the parties conducted extensive discovery. Pertinent to this appeal, the plaintiffs deposed Tele-dyne employee Howard Thompson during June 2006. During the deposition, counsel for Teledyne instructed Thompson, pursuant to Rule 26(b)(4)(B), Ala. R. Civ. P., not to answer many of the questions because Thompson was employed as a “senior technical advisor” in Teledyne’s legal department and was assigned to assist in the defense of this case.[3] In response, the plaintiffs moved to compel deposition responses from Thompson pursuant to Rule 37, Ala. R. Civ. P. The trial court denied the motion without a written order.
During June 2006, the plaintiffs also noticed the deposition of Cirrus employee *573 Bill King. Pursuant to Rule 80(b)(5), Ala. R. Civ. P., the notice asked King to produce certain documents at the deposition. After King failed to produce several of the requested documents, the plaintiffs moved to compel production of the documents pursuant to Rule 37, Ala. R. Civ. P. The trial court denied the motion without a written order.
The last scheduling order entered by the trial court cut off discovery on August 15, 2008, and set the case for trial on October 20, 2008. On August 29, 2008, the plaintiffs moved to amend their complaint, pursuant to Rule 15(b), Ala. R. Civ. P., to conform to the evidence. The plaintiffs sought to file a fourth amended complaint to add new claims alleging that the design of the heater-valve assembly and nonmetallic ductwork of the aircraft were defective, that the handbook for the aircraft failed to include adequate information about the performance of the aircraft at high altitudes, and that Teledyne and Cirrus had each made fraudulent misrepresentations of fact “when [they] held [themselves] out to be ... neutral part[ies] to the NTSB investigation team” investigating Swanstrom’s crash, as a result of which, the plaintiffs claimed, they were “forced to hire their own accident recon-structionists and endure years of unnecessary discovery regarding the failure mode of the subject aircraft’s engine and engine-driven fuel pump.” The trial court denied the motion without a written order.
On September 3, 2008, Teledyne moved for a summary judgment as to all the plaintiffs’ claims against it. That same day, Teledyne also moved to exclude the purportedly expert opinions of McSwain. Two days later, on September 5, 2008, Teledyne moved to strike the purportedly expert opinions of Sommer. Thereafter, Cirrus moved for a summary judgment as to all the plaintiffs’ claims against it, and it joined Teledyne’s summary-judgment motion and motion to exclude the opinions of McSwain. In their summary-judgment motions, Teledyne and Cirrus argued that the evidence relied upon by McSwain and Sommer was equally probative of a crash caused by pilot error resulting in a severe ground fire. Teledyne and Cirrus supported their theory of pilot error by noting that the climb rate of an aircraft decreases with increased density altitude and that Swanstrom lacked experience in “mountain flying.” Teledyne and Cirrus supported their summary-judgment motions with various evidence, including the NTSB report stating that it found no anomalies with the engine or the fuel pump following the crash, and testimony from Garr Thomas, who had performed an annual inspection on the aircraft in April 2002 and found no evidence during that inspection that the fuel pump was leaking. Teledyne and Cirrus also filed more than 30 motions in limine to exclude various evidence, including the statement of eyewitness Craig Carpenter, the toxicology report and all testimony based upon the report, and all testimony regarding any alleged effect of “toxic gases” and “products of combustion” on Swanstrom.
In response to the summary-judgment motions of Teledyne and Cirrus, the plaintiffs produced various evidence, including an affidavit of Sommer. In the affidavit, Sommer states, in pertinent part:
“As previously stated the design defect, which is common to all these engines, is the fact that the fuel pump is sandwiched between several accrute-ments [sic] stacked up like a ‘Dagwood sandwich.’ This stack up of parts which [Teledyne] refers to as ‘the fuel pump assembly’ is subject to several problems which include, bolt stretch, gasket preset, mating surface tolerances, vibratory issues, etc. The result is fuel leakage *574 between mating surfaces and/or seals. There is no requirement to engineer an alternative design for the reasons that within the general aviation industry there already exist many alternatives. It is a simple matter of having the pump stand alone, rather than be squeezed between a line of acrudiments [sic] such as adapter vapor separator, aneroid, and fuel mixture devices.”
On October 13, 2008, the trial court held a hearing on all pending motions. Two days later on October 15, 2008, the trial court issued a wide-ranging order excluding the toxicology report, all opinions based upon the toxicology report, Som-mer’s opinion that a fuel leak caused an inflight fire, Sommer’s opinion that “products of combustion” entered the cockpit of the aircraft, and Sommer’s opinion that Swanstrom was “essentially poisoned by the products of combustion.”
The next day, October 16, 2008, the trial court entered a summary judgment in favor of Cirrus as to the plaintiffs’ claims alleging breach of express and implied warranties. In a separate order issued later that day, the trial court entered a summary judgment in favor of Cirrus and Teledyne as to the plaintiffs’ negligence and strict-liability claims. That order stated, as follows:
“It appearing to the Court that, based upon the record as it appears at this time, Plaintiffs have failed to adduce substantial evidence that any alleged defect in the engine driven fuel pump proximately caused an in-flight fire resulting in the crash and death of [Swan-strom]. Lacking sufficient evidence on at least this critical element, Plaintiffs’ claims of negligence and strict liability are due to be dismissed.”
Notably, the trial court never ruled on the motions of Teledyne and Cirrus to exclude the purportedly expert opinions of McSwain and the statement of eyewitness Craig Carpenter.
The plaintiffs now appeal. Their appeal presents numerous legal issues, including: (1) whether the trial court erred in excluding the toxicology report; (2) whether the trial court erred excluding all expert testimony based upon the excluded toxicology report; (3) whether the trial court erred in excluding the purportedly expert opinions of Sommer; (4) whether the trial court erred in entering a summary judgment in favor of Cirrus and Teledyne on all the plaintiffs’ claims; (5) whether the trial court erred in denying the plaintiffs’ motion to amend the complaint to conform with the evidence; and (6) whether the trial court erred in denying the plaintiffs’ motions to compel the production of documents and information held by employees of Teledyne and Cirrus.

Standard of Review

In reviewing a ruling on the admissibility of evidence, including expert testimony, the standard is whether the trial court exceeded its discretion in excluding the evidence. In Bowers v. Wal-Mart Stores, Inc., 827 So.2d 63, 71 (Ala.2001), this Court stated: “When evidentia-ry rulings of the trial court are reviewed on appeal, ‘rulings on the admissibility of evidence are within the sound discretion of the trial judge and will not be disturbed on appeal absent an abuse of that discretion.’ ” (Quoting Bama’s Best Party Sales, Inc. v. Tupperware, U.S., Inc., 723 So.2d 29, 32 (Ala.1998).) As to the standard of review when the issue is whether a witness should be allowed to testify as an expert, “[t]he matter is ‘largely discretionary with the trial court, and that court’s judgment will not be disturbed absent an abuse of discretion.’ ” Kyser v. Harrison, 908 So.2d 914, 918 (Ala.2005) (quoting Hannah v. Gregg, Bland & Berry, Inc., 840 So.2d 839, 850 (Ala.2002)). Likewise, “ ‘this Court *575 has held consistently that “the grant or denial of leave to amend is a matter that is within the discretion of the trial court and is subject to reversal on appeal only for an abuse of discretion.” ’ ” Rector v. Better Homes, Inc., 820 So.2d 75, 78 (Ala.2001) (quoting Boros v. Baxley, 621 So.2d 240, 245 (Ala.1993)).
“This Court’s review of a summary judgment is de novo. Williams v. State Farm Mut. Auto. Ins. Co., 886 So.2d 72, 74 (Ala.2003). We apply the same standard of review as the trial court applied. Specifically, we must determine whether the movant has made a prima facie showing that no genuine issue of material fact exists and that the movant is entitled to a judgment as a matter of law. Rule 56(c), Ala. R. Civ. P.; Blue Cross & Blue Shield of Alabama v. Hodurski, 899 So.2d 949, 952-53 (Ala.2004). In making such a determination, we must review the evidence in the light most favorable to the nonmovant. Wilson v. Brown, 496 So.2d 756, 758 (Ala.1986). Once the movant makes a prima facie showing that there is no genuine issue of material fact, the burden then shifts to the nonmovant to produce ‘substantial evidence’ as to the existence of a genuine issue of material fact. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala.1989); Ala. Code 1975, § 12-21-12.”
Dow v. Alabama Democratic Party, 897 So.2d 1035, 1038-39 (Ala.2004).

Discussion

We begin our analysis by reviewing the trial court’s rulings excluding evidence produced by the plaintiffs in response to Teledyne’s and Cirrus’s summary-judgment motions. We then turn to the trial court’s denial of the plaintiffs’ motion to amend the complaint to conform to the evidence. Finally, we review the summary judgment in favor of Teledyne and Cirrus on all the plaintiffs’ claims.

A. Toxicology Report

The plaintiffs argue that the trial court erred in holding that the toxicology report is inadmissible because, they say, there is no evidence indicating that the blood samples upon which the toxicology report was based were compromised.
The order of the trial court excluding the toxicology report states:
“[Teledyne and Cirrus] argue that plaintiffs have failed to establish the required chain of custody for Swanstrom’s blood samples which are the subject of the report. Plaintiffs point to the procedures which should be followed for the collecting and handling of specimens analyzed by CAMI [the Civil Aerospace Medical Institute].[4] However, there is a significant dearth of evidence that the procedures were, in fact, followed. This Court cannot assume that they were. This issue is quite similar to one addressed in Birge v. State, 973 So.2d 1085 (Ala.Crim.App.2007). There the Court noted that:
“ ‘We can infer from the record that a courier transported the samples.... We would expect that someone at the laboratory received the samples and catalogued them into a tracking system; that the person who received the samples would have placed them in a secure, temperature-controlled location until the analyst or analysts retrieved the samples for testing; that the analyst or analysts would have *576 picked up the samples from the secure location and would have safeguarded them during the testing process to ensure that the samples were not contaminated or that the reliability of the test results was not otherwise compromised. However, all of the foregoing are matters of pure speculation because the State failed to establish the chain of custody for the samples after Dr. Pless’s assistant placed them in the refrigerator. ’
“Perhaps the procedure outlined by CAMI was followed in this case, but based upon the evidence of record, this Court cannot assume so. See also Green v. Alabama Power Co., 597 So.2d 1325 (Ala.1992) and Ex parte Holton, 590 So.2d 918 (Ala.1991).
“Plaintiffs argue that the chain of custody issue is overcome by the fact that the test results are included in a public record and thus admissible pursuant to Rule 803(8), Ala. R. Evid. Under [Rule] 803(8)(c), public documents may be excluded if ‘the sources of information or other circumstances indicate lack of trustworthiness.’ The record in the case is devoid of evidence indicating how the blood samples were handled, maintained, tested, safeguarded or how much time elapsed between the collection of the samples and the FAA laboratory’s analysis of them. Absent this evidence of trustworthiness, the Court finds that the FAA toxicology report is inadmissible.”
Under Alabama law, a party offering laboratory test results into evidence has the burden of establishing “a chain of custody without breaks in order to lay a sufficient predicate for admission of [the] evidence.” Ex parte Holton, 590 So.2d 918, 919 (Ala.1991) (citing Ex parte Williams, 548 So.2d 518, 520 (Ala.1989)). To guide the determination of whether a proper chain of custody as been established, this Court has set out the following test:
“[T]he record must show each link and also the following with regard to each link’s possession of the item: ‘(1) [the] receipt of the item; (2)[the] ultimate disposition of the item, i.e., transfer, destruction, or retention; and (3)[the] safeguarding and handling of the item between receipt and disposition.’ Im-winklereid, The Identification of Original, Real Evidence, 61 Mil. L.Rev. 145, 159 (1973).
“If the State, or any other proponent of demonstrative evidence, fails to identify a link or fails to show for the record any one of the three criteria as to each link, the result is a ‘missing’ link, and the item is inadmissible.”
Ex parte Holton, 590 So.2d at 920; see also Birge v. State, 973 So.2d 1085, 1093 (Ala.Crim.App.2007) (noting that the Court of Criminal Appeals and this Court have “consistently cited and relied on Ex parte Holton for its statement of the principles establishing the legal requirements for proving a proper chain of custody”).
The plaintiffs contend that the chain-of-custody requirements in a civil action should be less than the requirements in a criminal proceeding. We find no merit to the argument, and the plaintiffs have not cited any authority in support of the argument. Indeed, Rule 101, Ala. R. Evid., states that the Alabama Rules of Evidence apply to “all proceedings in the courts of the State of Alabama,” and this Court has equally applied chain-of-custody requirements in civil and criminal cases. Compare Green v. Alabama Power Co., 597 So.2d 1325 (Ala.1992), with Ex parte Holton, 590 So.2d at 920.
In Green, a wrongful-death action, this Court recognized that chain-of-custody requirements are particularly applicable to *577 evidence involving human specimens such as blood. There, this Court held:
“In chain-of-custody cases involving ‘specimens taken from the human body,’ the proponent of the evidence must demonstrate ‘ “where and by whom the specimen was kept and through whose hands it passed.” J. Richardson, Modem Scientific Evidence, Section 13.14a (2d ed.1974). Gothard v. State, 452 So.2d 889, 890 (Ala.Cr.App.), cert. stricken, 450 So.2d 479 (Ala.1984).’ Suttle v. State, 565 So.2d 1197, 1199 (Ala.Crim.App.1990) (reversing vehicular homicide conviction for failure of prosecution to account for blood sample during four-day interval between delivery of unsealed sample to police officer and reception at laboratory). If ‘ “the substance analyzed has passed through several hands the evidence must not leave it to conjecture as to who had it and tvhat was done with it between the taking and the analysis.” Rodgers v. Commonwealth, 197 Va. 527, 90 S.E.2d 257, 260 (1955) (emphasis added).’ Suttle, 565 So.2d at 1199.”
Green, 597 So.2d at 1332.
In the present case, we conclude that the trial court did not exceed its discretion in excluding the toxicology report because the chain of custody of the toxicology kit and blood samples in that kit is riddled with missing links. The evidence presented by the plaintiffs indicates that blood samples taken from Swanstrom’s body were unaccounted for during the eight days between the time they were collected in New Mexico and the time they arrived in Oklahoma City. The toxicology report notes only the date of receipt of the kit in Oklahoma City and the name of the person who analyzed the samples. Thus, the toxicology report lacks any information regarding the condition of the blood samples upon receipt, whether the toxicology kit and the samples were sealed when they were received, who received the blood samples at the FAA, how the samples were stored prior to testing, the date of testing, or the method of testing. Although the plaintiffs did produce the FAA guidelines for handling blood samples, they failed to produce evidence indicating that these guidelines were followed.[5]
Notwithstanding the missing links in the chain of custody of the blood samples, the plaintiffs argue that the toxicology report is admissible as a public record under Rule 803(8), Ala. R. Evid. Rule 803(8) provides an exception to the general hearsay rule for certain public records, including investigative findings from public agencies such as the FAA. A public record, however, is not guaranteed admissibility under Rule 803(8) merely because it is a public record. See Charles Gamble, McElroy’s Alabama Evidence § 266.01(1) (5th ed.1996). First, the record must fall into one of three categories set out in Rule 803(8) — activities of a public office or agency, matters observed by public officials, or factual findings resulting from an investigation. Second, Rule 803(8) grants trial courts the discretion to exclude an otherwise qualified public record from evidence if “the sources of information or other circumstances indicate a lack of trustworthiness.”
Here, we conclude that the trial court did not exceed its discretion in finding that the toxicology report lacked trustworthiness. The lack of information about the date on which the FAA tested Swan-strom’s blood samples causes concern be *578 cause carbon monoxide and cyanide are naturally present in postmortem blood samples, and the plaintiffs’ proffered pathology and toxicology experts both testified that the levels of carbon monoxide and cyanide in blood may be distorted by delayed testing and improper handling. Based upon the evidence presented to the trial court, more than two months may have passed between the date of Swan-strom’s death and the date on which the FAA tested the blood samples. The toxicology report states that the FAA received Swanstrom’s blood samples on June 7, 2002, yet the FAA issued the toxicology report on July 30, 2002, with no indication of the date on which it tested the blood samples. In addition, the plaintiffs have not produced any evidence indicating how Swanstrom’s blood samples were transported, stored, and safeguarded. Based upon missing links in the chain of custody of the blood samples, we conclude that the trial court reasonably found that the toxicology report lacked trustworthiness and correctly held that is was inadmissible.

B. Testimony Based upon the Toxicology Report

The plaintiffs next argue that, even if we conclude that the trial court did not err in determining that the toxicology report is inadmissible, the trial court erred in precluding testimony based upon the toxicology report.
The order of the trial court excluding all testimony providing opinions based on the toxicology report states:
“[Teledyne and Cirrus] move to exclude the opinions proffered by plaintiffs’ experts which are based upon these now excluded test results. The motion is well taken. Counsel for plaintiffs argues that Rule 708 of the Aabama Rules of Evidence still permits an expert to rely upon facts or data not admissible into evidence. This clearly is not the case. As Professor Gamble writes,
“ ‘An expert, for example, may not base his opinion upon the statement of others unless those statements have been admitted into evidence. This is particularly so when the statements relied upon are themselves the opinions of others. The adoption of Rule 703 is a rejection of the federal rule under which an expert may base an opinion upon evidence that [in] itself is inadmissible so long as it is a type reasonably relied upon by experts in the field.’
“Gamble, Alabama Rules of Evidence (2d ed.), p. 306. See also Franklin v. Etheridge, 4 So.3d 532 (Ala.Civ.App.2008); Golden v. Stein, 670 So.2d 904, 907 (Ala.1995) (noting that an expert’s opinion cannot be based upon facts not in evidence).
“For the foregoing reasons, plaintiffs are hereby precluded from introducing into evidence the results of any test performed on the blood samples taken from the decedent, making any reference, remarks or argument in the presence of the jury concerning this evidence. Additionally, plaintiffs may not elicit testimony from any expert witness, specifically, but not limited to, Dr. Sor-rell Schwartz[6] and Dr. Donald Sommer regarding opinions based upon these test results.”
The plaintiffs argue that the trial court erred in excluding testimony based upon the toxicology report because, they say, this Court has previously permitted expert testimony that is based upon inadmissible evidence. In support of this argument, the plaintiffs note that the trial court quoted from the second edition of McElroy’s *579 Alabama Evidence and that the fifth edition of that treatise recognizes that
“Alabama’s rule precluding expert testimony based upon inadmissible facts or data, however, has been judicially breached on numerous occasions. Experts are allowed, for example, to give opinions as to value based in part on hearsay evidence. Additionally, the judiciary has approved the use of a toxicologist’s autopsy report as a basis for a deputy coroner’s expert testimony.”
Gamble, McElroy’s Alabama Evidence § 127.02(5) (5th ed.1996) (citing Owens v. Rado, 659 So.2d 87 (Ala.1995); Volkswagen of America, Inc. v. Marinelli, 628 So.2d 378 (Ala.1993); Ex parte Wesley, 575 So.2d 127, 129 (Ala.1990); and Jackson v. State, 412 So.2d 302 (Ala.Crim.App.1982)).
Alabama law is clear that information upon which an expert relies must generally be introduced into evidence. “Rule 703, Ala. R. Evid., requires that the facts or data relied upon by the expert in testifying and procured by the expert other than by firsthand knowledge generally must be admitted into evidence.” Ex parte Deardorff, 6 So.3d 1235, 1242 (Ala.2008) (citing McElroy’s Alabama Evidence § 127.02(5)). This Court has found exception to this general rule in holding that hearsay that is “ ‘customarily relied on by experts and likely to be trustworthy is a proper basis for an expert opinion.’”[7] Volkswagen of America, 628 So.2d at 387 (quoting Brown Mech. Contractors, Inc. v. Centennial Ins. Co., 431 So.2d 932, 944 n. 6 (Ala.1983) (emphasis added)). In Nash v. Cosby, 574 So.2d 700 (Ala.1990), this Court also modified the general rule by allowing a medical expert to give opinion testimony based in part on the opinions of others when those opinions are found in the medical records admitted into evidence. In Ex parte Wesley, this Court noted that Nash did not change “the traditional rule followed in Alabama that the information upon which the expert relied must be in evidence.” 575 So.2d at 129 (footnote omitted).
As we have already discussed, the trial court did not exceed its discretion in finding that the toxicology report was untrustworthy and, therefore, inadmissible. Consequently, it follows that the trial court did not exceed its discretion in precluding the plaintiffs from introducing any testimony based upon inadmissible evidence such as the toxicology report.

C. Purportedly Expert Opinions of Som-mer

The plaintiffs next argue that the trial court erred in excluding the purportedly expert opinions of Sommer. The trial court’s order excluding Sommer’s opinions regarding the existence of an in-flight fuel fire and the effects of an in-flight fuel fire on Swanstrom states:
“After considering the evidence of record and the lengthy arguments of counsel, the Court finds that the plaintiff has failed to demonstrate that Sommer is qualified to offer an opinion as to the existence of an in-flight fire. While Sommer has experience as an accident investigator, he has no background in fire safety, fire investigation and he admits of no familiarity with the standards as they relate to analysis of fire patterns. Further, plaintiffs offer nothing to suggest that he has achieved a level of expertise to distinguish the signature of a pre-impact fire from the ashes of a *580 post-impact conflagration. Beyond ‘even an idiot knows an exhaust system will ignite gasoline,’ Sommer articulates few evidentiary underpinnings for his conclusion about an in-flight fire. He expresses no opinion as to how much gasoline was leaking from the fuel pump, at what temperature the fuel would ignite, what temperature the exhaust system reached under the subject flight conditions and/or what other components of the engine were ‘hot enough’ to ignite the undetermined amount of fuel which was allegedly leaking from the engine driven fuel pump.
“The fact that an exhaust system may ignite leaking fuel does not warrant the conclusion that it did so on this occasion. Sommer’s conclusion that ‘even an idiot knows’ and plaintiffs’ counsels’ argument that there were ‘plenty of things’ in the engine compartment to ignite the fuel, do not provide a sufficient evidentiary predicate for Sommer’s opinion regarding an in-flight fire.2
“2The Court acknowledges that its conclusion in this regard subjects it to the obvious criticism that its reasoning abilities fall short of our hypothetical idiot.”
The admissibility of expert testimony is governed by Rule 702, Ala. R. Evid., which provides:
“If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.”
A determination of whether a witness is qualified to give an expert opinion falls within the broad discretion of the trial court. See Townsend v. General Motors Corp., 642 So.2d 411, 423 (Ala.1994) (“whether a particular witness will be allowed to testify as an expert is left to the sound discretion of the trial court”); Burroughs Corp. v. Hall Affiliates, Inc., 423 So.2d 1348, 1353 (Ala.1982) (“Whether or not a particular witness will be allowed to testify as an expert is in the sound discretion of the trial court, whose decision will not be disturbed on appeal except for palpable abuse.”).
Even if a witness is qualified to give expert testimony on a particular subject, the testimony cannot be based on “mere speculation and conjecture.” Townsend, 642 So.2d at 422. To date this Court has applied the “general acceptance test” set out in Frye v. United States, 293 F. 1013, 1014 (D.C.Cir.1923), as the standard for admitting expert testimony. Under this test, “a person who offers an opinion as a scientific expert must prove that he relied on scientific principles, methods, or procedures that have gained general acceptance in the field in which the expert is testifying.” Slay v. Keller Indus., Inc., 823 So.2d 623, 626 (Ala.2001) (citing Frye, 293 F. at 1014). “Mere assertions of belief, without any supporting research, testing, or experiments, cannot qualify as proper expert scientific testimony under either the ‘general-acceptance’ standard enunciated in Frye or the ‘scientifically reliable’ standard of Daubert [v. Merrell Dow Pharmaceuticals, Inc.], 509 U.S. 579 (1993).” Slay, 823 So.2d at 626.
Our review of the record in this case supports the conclusion that the trial court did not exceed its discretion in finding that Sommer was not properly qualified to give an expert opinion that a leaky fuel pump caused an in-flight fire that resulted in the crash and in finding that Sommer failed to establish “a sufficient evidentiary predicate” for such an opinion. The plaintiffs have not produced evidence indicating that *581 Sommer had any education and training in the area of fire causation or fire-origin analysis other than his general experience investigating aviation accidents that involved fires. This lack of education and training in the field of fire causation and origin is particularly problematic in this case because Sommer was charged with the task of examining the charred wreckage of the aircraft and determining whether any defect or damage was caused by a pre-crash fire or the post-crash fire.[8] Indeed, in a deposition, Sommer testified that the post-crash fire was “a fairly severe fire” that made it difficult to distinguish pre-crash from post-crash burn damage and that it was “possible” that the soot patterns on the fuel pump could have resulted from the post-crash fire. Moreover, Sommer does not provide any scientific methodology for determining whether leaking fuel could have ignited during Swanstrom’s four- or five-minute flight. In Sommer’s words, if “even an idiot knows how an exhaust system will ignite gasoline,” his expert testimony will not assist a jury in understanding whether a fuel leak caused an in-flight fuel fire aboard the aircraft.
We further conclude that the trial court did not exceed its discretion in finding that Sommer was not qualified to give an expert opinion that toxic gases from an in-flight fire entered the cockpit of the aircraft and caused Swanstrom to become confused. The order of the trial court states:
“Plaintiffs further proffer the opinion of Donald Sommer that ‘products of combustion’ from the engine fire entered the cockpit. His opinions in this regard appear to be based upon the results of the toxicology report[,] which has been excluded, and the opinions of Dr. Sorrell Schwartz. To the extent that this professed opinion is based upon inadmissible evidence and the opinion of others, i.e., Dr. Schwartz, it is inadmissible. Kimberly[-]Clark Corp. v. Sawyer, 901 So.2d 738 (Ala.Civ.App.2004)....
[[Image here]]
“In an apparent effort to explain some of the pilot’s actions after takeoff, Som-mer expressed the opinion that [Swan-strom] was ‘well under way of being essentially poisoned by the products of combustion.’ Plaintiffs proffered no relevant educational training or experience to qualify Sommer to express this opinion. Further, to the extent that it is based on the inadmissible toxicology report or the opinion of Dr. Schwartz it is also inadmissible. Accordingly, defendants’ Motion in Limine is granted, and Sommer is hereby precluded from expressing this opinion to the jury.”
The trial court correctly found that the plaintiffs have not produced any evidence indicating that Sommer has any education, training, or experience related to the emission of toxic gases from fires caused by aviation fuel or the effects of such gases on individuals. Sommer failed to qualify his opinion that Swanstrom was incapacitated by the toxic gases with any scientific methodology that correlates levels of carbon monoxide and/or cyanide with a state of *582 mental incapacitation. Accordingly, we conclude that the trial court did not exceed its discretion in excluding Sommer’s testimony regarding the emission of toxic gases from the alleged in-flight fuel fire.

D. Amendment of the Complaint

The plaintiffs further argue that the trial court erred in denying their motion entitled “Plaintiffs’ Motion to Amend to Conform with the Evidence,” which sought to amend the complaint to add new claims against Teledyne and Cirrus. In the motion, the plaintiffs asserted that they sought to amend the complaint pursuant to Rule 15(b), Ala. R. Civ. P., because “[d]uring the last several years ... new evidence has come to light.” The trial court denied the motion without a written order. The plaintiffs now argue that the trial court erred in denying the motion because, they say, neither Teledyne nor Cirrus would be prejudiced by the proposed amendment.
Regardless of whether Teledyne and Cirrus would be prejudiced by the proposed amendment, the plaintiffs’ motion is ill-founded because Rule 15(b) provides for amendments to the complaint in order to conform to evidence presented during a trial, and there has been no trial in this case. Rule 15(b) states, in pertinent part: “When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings.” (Emphasis added.) In short, because Rule 15(b) is inapplicable, we cannot reverse the trial court’s order denying the plaintiffs’ motion.
Moreover, even if the plaintiffs’ motion is treated as a motion to amend the complaint pursuant to Rule 15(a), Ala. R. Civ. P. (an argument the plaintiffs do not make), we conclude that the trial court did not exceed its discretion in denying the motion. The liberal policy of allowing amendments under Rule 15 “ ‘is not carte blanche authority to amend ... at any time.’ ” Burkett v. American Gen. Fin., Inc., 607 So.2d 138, 141 (Ala.1992) (quoting Stallings v. Angelica Uniform Co., 388 So.2d 942, 947 (Ala.1980)). A trial court is afforded discretion to deny an amendment for good cause, and this Court has recognized undue delay in its proceedings as good cause. See Ex parte GRE Ins. Group, 822 So.2d 388, 390 (Ala.2001); Horton v. Shelby Med. Ctr., 562 So.2d 127, 130 (Ala.1989). When the plaintiffs filed the motion to amend their complaint, the discovery period had ended and allowing further amendment to the complaint would have required additional discovery and would have further delayed the trial setting. Simply, “the trial court has discretion, in the interests of justice, to deny an amendment for reasons of prejudice or undue delay.” Blackmon v. Nexity Fin. Corp., 953 So.2d 1180, 1190 (Ala.2006).[9]
The plaintiffs filed the motion on August 29, 2008, 2 weeks after the trial court’s last amended scheduling order stated that all discovery should be completed and less than 60 days before the date set for trial. The trial court denied the motion to amend *583 without providing any reasoning; it did not err in doing so.

E. Summary Judgment

Regardless of whether the trial court exceeded its discretion in excluding the toxicology report and the testimony related to the toxicology report and the expert opinions of Sommer, the plaintiffs argue that the trial court erred in entering a summary judgment in favor of Teledyne and Cirrus on all of their claims. Specifically, the plaintiffs argue that the trial court failed to view the evidence in their favor as the nonmoving party, prematurely shifted the burden of proof to them, and overlooked substantial evidence indicating that a leaky fuel pump had caused the crash in which Swanstrom was killed.

1. Negligence and Stride-Liability Claims

As noted above, the trial court entered a summary judgment in favor of Teledyne and Cirrus without ruling upon the motions to exclude the expert testimony of McSwain. Because there is no indication in the record that the trial court excluded McSwain’s expert opinions, this Court assumes that the trial court considered McSwain’s report when it ruled on Teledyne’s and Cirrus’s summary-judgment motions. See Hannah, 840 So.2d at 850 (holding that when the record does not indicate that the trial court ruled upon a motion to strike expert testimony, an appellate court must assume that the trial court considered the expert testimony); Travis v. Ziter, 681 So.2d 1348, 1351 (Ala.1996) (“Because there was no indication ... that the court had excluded the affidavits, we must assume that the circuit court considered them when it ruled on the motions.”). Therefore, even with McSwain’s expert opinions before the trial court, that court found that the “plaintiffs failed to produce substantial evidence that any alleged defect in the engine-driven fuel pump proximately caused an in-flight fire resulting in the crash and death of Swan-strom.”
Under New Mexico law,[10] the plaintiffs must produce evidence indicating that a defect in the engine and/or the fuel pump caused the crash resulting in Swan-strom’s death to establish a prima facie case for their negligence and strict-liability claims. “It is well-established in New Mexico negligence law that manufacturers and distributors of products have a duty to use ordinary care in producing products so as to avoid a foreseeable risk of injury caused by a condition of the product or manner in which it is used.” Smith v. Bryco Arms, 131 N.M. 87, 94, 33 P.3d 638, 645 (N.M.Ct.App.2001). It is “the plaintiffs burden in a negligence case to prove the element of proximate causation.” Lewis ex rel. Lewis v. Samson, 131 N.M. 317, 331, 35 P.3d 972, 986 (2001). “Under the strict products liability theory, a supplier of products is liable for harm proximately caused by an unreasonable risk of injury resulting from a condition of the product or from a manner of its use.” Smith, 131 N.M. at 93, 33 P.3d at 644. To succeed on a theory of strict liability, a plaintiff must prove “a defect in the product when it leaves the maker’s control and the causal connection between the defect and an injury.” State Farm Fire & Cas. Co. v. Miller Metal Co., 83 N.M. 516, 518, 494 P.2d 178, 180 (N.M.Ct.App.1971).
The issue here becomes whether the evidence produced by the plaintiffs, sub *584 tracting the evidence excluded by the trial court, was substantial evidence that a defect in the engine and/or the fuel pump caused the crash that resulted in Swan-strom’s death. The plaintiffs contend that the following evidence would support a jury verdict on its negligence and strict-liability claims: (1) Brooks’s testimony that the aircraft “started to sputter as it was trying to elevate higher”; (2) McSwain’s expert opinion that microscopic evidence of lead and bromine on the fuel pump demonstrates that the fuel pump leaked during Swanstrom’s flight; (3) McSwain’s expert opinion that the burn patterns on the right side of the engine indicate an in-flight fuel fire; (4) McSwain’s expert opinion that “metallurgic evidence” indicates that the engine was not producing power at the time of the accident; (5) “the clear, sunny and cool weather conditions experienced by pilot Swan-strom on takeoff from Angel Fire”; (6) Swanstrom’s piloting experience; and (7) “the fact that pilot Swanstrom’s ultimate flight to the south is inconsistent with a trip back to Duluth, Minnesota.” Plaintiffs’ brief, pp. 39, 41.
Viewing this evidence in the light most favorable to the plaintiffs, we conclude that they have produced substantial evidence to establish a genuine issue of material as to whether the crash of the aircraft and the resulting death of Swanstrom was proximately caused by Teledyne’s negligence in designing and manufacturing the fuel pump and/or Cirrus’s negligence in installing the fuel pump in the aircraft. A review of McSwain’s reports shows that the fuel pump “was found with loose pump segments subsequent to the accident,” and he concluded that the fuel pump had leaked because it was “defective as assembled” with “either inadequate assembly torque or the inability of the pump thru-bolts and Belleville washers to take up the loss of clamp-up force.” McSwain further concluded that the burn patterns and residue deposits on the engine and the fuel pump indicated an in-flight fuel fire. In addition, although the trial court excluded much of Sommer’s expert testimony, the trial court did not exclude the purportedly expert opinions of Sommer that a design defect in the fuel pump resulted in fuel leakage.
Based upon McSwain’s report, Sommer’s affidavit, and eyewitness testimony that sputtering noises were coming from the aircraft shortly before it crashed, we conclude that there is substantial evidence from which the jury could find that the fuel pump was defective as designed and assembled by Teledyne and/or that the aircraft was defective as assembled by Cirrus, and that these defects probably caused an in-flight fuel fire. From this evidence, a reasonable jury could further infer that an in-flight fuel fire caused the aircraft to crash. “ ‘[I]t is well established that the question of proximate cause is almost always a question of fact to be determined by the jury, and that the question must go to the jury if reasonable inferences from the evidence support the plaintiffs evidence.’ ” Norris v. City of Montgomery, 821 So.2d 149, 155 n. 8 (Ala.2001) (quoting Lemond Constr. Co. v. Wheeler, 669 So.2d 855, 862 (Ala.1995)). In sum, drawing reasonable inferences in a light most favorable to the plaintiffs, we conclude that a jury could find that the negligence of Teledyne and Cirrus caused the crash and that the aircraft and the fuel pump were unreasonably dangerous. Therefore, we conclude that the trial court erred in entering a summary judgment in favor of Teledyne and Cirrus as to the plaintiffs’ negligence and strict-liability claims.

2. Breachr-of-Warmnty Claims

The plaintiffs also argue that the trial court erred in dismissing their claims of *585 breach of implied warranty and breach of express warranty against Cirrus.

a. Implied Warranties

The trial court granted Cirrus’s summary-judgment motion as to the plaintiffs’ breach-of-implied-warranty claims finding that under Minnesota law such claims merge into the plaintiffs’ strict-liability claims.[11] The plaintiffs argue that Minnesota courts have not conclusively merged breach-of-implied-warranty claims into strict-liability claims and that “even if Minnesota had merged strict liability and the implied warranty of merchantability ... Cirrus would still be liable under both strict liability and implied warranty of fitness.” Plaintiffs’ brief, p. 75.
Minnesota law recognizes two types of implied warranties: merchantability and fitness. An implied warranty of merchantability requires that the goods be “fit for the ordinary purposes for which goods of that type are used.” Minn.Stat. § 336.2A-212. An implied warranty of fitness requires that the goods “be fit for th[e] purpose” that the seller specifies. Minn.Stat. § 336.2A-213; see also Minn. Stat. § 336.2-315, Minnesota Code Cmt. (describing “[t]he implied warranty of fitness for a truly particular purpose, as distinguished from the ordinary purpose for which goods are used”).
In this case, the complaint does not specify whether the plaintiffs are alleging claims based on implied warranties of merchantability or fitness. However, the complaint does not allege that Cirrus, at the time of contracting, had reason to know any particular purpose for which the aircraft was to be used or that Swanstrom was relying on Cirrus’s judgment to select an aircraft appropriate for a particular purpose. See Minn.Stat. § 336.2-315 (defining the term “implied warranty; fitness for a particular purpose”). Rather, the complaint contains general allegations that Cirrus warranted that the aircraft was “reasonably fit for its intended and foreseeable use and purpose, free of defects, and safe and in airworthy condition.” Accordingly, we conclude that the complaint alleges the more general claim of breach of an implied warranty of merchantability.
The plaintiffs argue that the trial court erred in finding that their breaeh-of-im-plied-warranty claims merged into their strict-liability claims under Minnesota law. In support of this argument, the plaintiffs rely on an unpublished opinion of the Court of Appeals of Minnesota stating that “Minnesota law does not appear to have resolved conclusively whether submitting [strict-liability and breach-of-implied-warranty-of-merchantability] theories to a jury is appropriate.” State Farm Fire Cas. Co. v. Burns, No. C9-94-735 (Minn.Ct.App., Nov.15, 1994) (not reported in N.W.2d). Our review of Minnesota law demonstrates that breach-of-implied-warranty-of-merchantability claims are merged into strict-liability claims for design and manufacturing defects when strict liability is the broader theory of recovery. See Bilotta v. Kelley Co., 346 N.W.2d 616, 623 (Minn. 1984) (“a trial court could properly submit a design-defect or failure-to-warn case to a jury on a single theory of products liability”); Goblirsch v. W. Land Roller Co., 310 Minn. 471, 476, 246 N.W.2d 687, 690 (1976) (finding no prejudice in failure to instruct the jury on both express- and implied-warranty theories because a “stronger and broader” strict-liability instruction was given); In re Shigellosis Litigation, 647 *586 N.W.2d 1, 11 (Minn.Ct.App.2002) (stating that “when an instruction on strict liability is stronger and broader under the case facts, it would be redundant and confusing to instruct on breach of implied warranty”); Gross ex rel. Gross v. Running, 403 N.W.2d 243, 245 (Minn.Ct.App.1987) (holding that in Bilotta “the Minnesota Supreme Court merged strict liability, negligence, and implied warranty remedies into a single theory of products liability”); and Continental Ins. Co. v. Loctite Corp., 352 N.W.2d 460, 463 (Minn.Ct.App.1984) (stating, in addressing propriety of jury instructions, that in cases where “strict liability is the broader theory of recovery ... [implied warranties are] pre-empted”). The United States Court of Appeals for the Eighth Circuit, applying Minnesota law, has explained that Minnesota courts have merged the theory of implied warranty of merchantability into the theory of strict products liability because an implied warranty of merchantability is “analogous to the theory of strict liability for design defect, which refers to harm that results when a product ‘is put to its intended use.’ ” Piotrowski v. Southworth Prods. Corp., 15 F.3d 748, 751 (8th Cir.1994) (quoting 4 Minnesota Practice, CIV. JIG 101 & 117 (3d ed.1986)).
In the present case, we conclude that the trial court correctly found that under Minnesota law the plaintiffs’ claims of implied warranty of merchantability merged into the plaintiffs’ strict-liability claims because the plaintiffs’ strict-liability claims that “Cirrus ... designed, manufactured, built, constructed, and/or assembled the subject incident aircraft in such a way that it was unreasonably dangerous for operation by the reasonable and prudent pilot” are stronger and broader than the plaintiffs’ breach-of-implied-warranty-of-merchantability claims. Accordingly, we conclude the plaintiffs’ claims of breach of implied warranty of merchantability do not survive and, therefore, that the trial court properly entered a summary judgment in favor of Cirrus on the breach-of-implied-warranty claims.

b. Express Warranties

The plaintiffs also argue that the trial court improperly entered a summary judgment in favor of Cirrus as to their breach-of-express-warranty claims because, they say, genuine issues of material fact exist regarding Cirrus's alleged breach of any express warranties. The trial court dismissed the plaintiffs’ claims of breach of express warranty, finding that the plaintiffs had failed to produce substantial evidence of the existence of an express warranty. Under Minnesota law, “[t]o prevail on a warranty claim the plaintiff must prove the existence of a warranty, a breach, and a causal link between the breach and the alleged harm.” Schweich v. Ziegler, Inc., 463 N.W.2d 722, 730 (Minn.1990). The Minnesota Supreme Court has held that “[n]o particular words are required to constitute an express warranty,” McCormack v. Hankscraft Co., 278 Minn. 322, 336, 154 N.W.2d 488, 498 (1967); however, Minnesota statute § 336.2-313(1) provides that an express warranty may be created as follows:
“(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes paH of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
“(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.
“(c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the *587 whole of the goods shall conform to the sample or model.”
(Emphasis added.)
Here, the plaintiffs argue that a statement in a letter from the vice president of sales and marketing for Cirrus, Thomas Shea, to Swanstrom, stating that “our commitment is to produce for you the highest quality safest aircraft available in the world today” created an express warranty that the aircraft was safe and airworthy. Even though Cirrus mailed the letter after Swanstrom had executed the purchase agreement for the aircraft, the plaintiffs contend that the letter modified the purchase agreement. We find this argument to be without merit because the purchase agreement, by its terms, operates as the sole agreement between Cirrus and Swan-strom for the sale of the aircraft. Section 12.01 of the purchase agreement states:
“This agreement is the only Agreement controlling the purchase and the Sale of the aircraft. The Purchaser expressly acknowledges that Purchaser has not relied on any oral or written representations of the Seller except as specifically stated in this agreement. Further the Seller has made no representations of the suitability of the Aircraft for any particular purpose of the Purchaser. The aircraft is a general aviation aircraft and is specifically limited in use for general aviation.”
The plaintiffs also contend that advertisements from Cirrus created express warranties that the aircraft was safe and airworthy. Yet this vague contention is not supported by a description of any affirmations made by Cirrus in an advertisement or any evidence indicating that Swan-strom’s decision to purchase the aircraft was affected by a Cirrus advertisement.
We conclude that the plaintiffs have not produced substantial evidence of the existence of an express warranty because neither the letter nor the advertisements modified the purchase agreement to constitute the “basis of the bargain” for the aircraft.

Conclusion

For the foregoing reasons, we conclude that the trial court did not err in excluding certain evidence, and we affirm the trial court’s summary judgment with respect to the plaintiffs’ breach-of-warranty claims against Cirrus. We reverse the trial court’s summary judgment with respect to the plaintiffs’ negligence and strict-liability claims against Teledyne and Cirrus, and we remand the case to the trial court for additional proceedings.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
COBB, C.J., and WOODALL, PARKER, and SHAW, JJ., concur.

. See 49 U.S.C §§ 1131 and 1132 (providing that the NTSB has the exclusive authority to investigate all civil-aviation accidents). The NTSB investigated the crash with technical assistance of an employee from Teledyne, John Kent, and an employee from Cirrus, Mike Busch.

. The trial court had personal jurisdiction over Teledyne because Teledyne maintains its principal place of business in Mobile and the engine in Swanstrom’s aircraft was designed and manufactured at a Teledyne facility in the State of Alabama. The trial court had personal jurisdiction over Cirrus, a Minnesota corporation, because Cirrus conducts continuous and systematic business within the State of Alabama. See Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414-16, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984) (holding that "continuous and systematic contacts” with a state can form a basis for personal jurisdiction).

. Rule 26(b)(4)(B) provides as follows:
"A party may discover facts known or opinions held by an expert who has been retained, specially employed or assigned by another party in anticipation of litigation or preparation for trial and who is not expected to be called as a witness at trial, only as provided in Rule 35(b) or upon a showing of exceptional circumstances under which it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by other means.”

. The Civil Aerospace Medical Institute is located at the FAA's Monroney Aeronautical Center in Oklahoma City, Oklahoma.

. Dr. Schwartz was a third expert witness retained by the plaintiffs.

. Notably, "Rule 703 is taken verbatim from Fed.R.Evid. 703, but it omits that portion of tire federal rule providing that an expert may base an opinion upon inadmissible evidence if it is of a type reasonably relied upon by experts in the particular field in forming opinions.” Rule 703, Ala. R. Evid., Advisory Committee's Notes.

. During a deposition, Sommer could not recall the basic tenets of fire-cause and fire-origin investigation in an aviation accident, as noted by the following exchange:
"Q: Will you describe for me the standards that relate to the analysis of fire patterns?
"A: No.
"Q: Can you describe for me the type of fire patterns, the common types of fire patterns?
“A: Not without reviewing the materials.
"Q: Okay. Well, just give me the basic fire patterns that exist from fires.
“A: Not without reviewing the materials.”

. We pretermit consideration of the plaintiffs’ arguments that the trial court erred in denying their motions to compel production of certain deposition responses and documents from Teledyne employee Howard Thompson and Cirrus employee Bill King because the plaintiffs did not submit any Rule 56(f), Ala. R. Civ. P., affidavits in the trial court to assert that the requested discovery was essential to their case. The plaintiffs, in their reply brief, acknowledge that “Rule 56(f) is inapplicable to [their] appeal,” and "[they] do not contend that the trial court's summary judgment decision would have differed if the court had compelled discovery from Mr. Thompson and Mr. BCing.” Plaintiffs’ reply brief, p. 35 n. 7.

. It is undisputed that New Mexico law applies to the plaintiffs' negligence and strict-liability claims.

. It is undisputed on appeal that Minnesota law applies to the plaintiffs’ breach-of-warranty claims.